209 A.2d 215.
UNITED TRANSIT COMPANY *vs.* FRANK L. NUNES,
*Public Utility Adm'r.*
MARLENE K. SMITH *vs.* SAME.

APRIL 12, 1965.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Joslin, JJ.

JOSLIN, J. These are separate appeals by the United Transit Company, hereinafter referred to as the Company, and Marlene K. Smith, from an order of the public utility administrator dated July 20, 1964. The Company, on May 20, 1964, pursuant to sec. 7 of its charter as amended by P. L. 1959, chap. 144, petitioned the administrator to permit an upward revision of its fare structure and in addition to authorize discontinuance, curtailment and rerouting of certain of its routes or portions thereof. The order appealed from granted the Company relief but not in the manner and to the degree requested.

504

It is provided by sec. 7 that the administrator must grant relief to the Company "in a manner and to the degree" that will enable it to maintain an operating ratio of not in excess of 94 per cent before federal income taxes or to secure a rate of return on its rate base of at least 5 per cent for the twelve-months period next succeeding the granting thereof upon a showing that for the period of six months next preceding the filing of the petition the operating ratio had been exceeded or the fixed minimum rate of return not attained. The manner of relief contemplated by the statute in such circumstances is limited to a revision of the fare structure, or a reduction in the bus mileage operated on nonprofitable routes or any portion thereof, or a combination of fare revisions and mileage reductions. *United Transit Co.* v. *Public Utility Hearing Board,* 96 R. I. 435, 192 A.2d 423.

In reviewing an order of the administrator we confine ourselves to a consideration of its lawfulness and reasonableness and his findings of fact will not be disturbed if they are fairly and substantially supported by legal evidence. *United Transit Co.* v. *Public Utility Hearing Board, supra; Town of Jamestown* v. *Kennelly,* 81 R. I. 177; *Town of Middletown* v. *Newport Water Corp.,* 53 R. I. 435. If, however, we are unable to ascertain with reasonable certainty the true basis of his decision and the factual premises upon which his findings of fact rest, we will neither speculate thereon nor search the record for evidence in support thereof, nor will we decide for ourselves what is proper in the circumstances. *United Transit Co.* v. *Public Utility Hearing Board, supra; Capaldo* v. *Public Utility Hearing Board,* 95 R. I. 442, 187 A.2d 783; *New England Tel. & Tel. Co.* v. *Kennelly,* 81 R. I. 1; *United Electric Rys.* v. *Kennelly,* 80 R. I. 64; *Capaldo* v. *Public Utility Hearing Board,* 70 R. I. 356.

It is the duty of the administrator to set forth the evidence and find the facts; our duty is to determine whether

the order entered was within his jurisdiction as well as its lawfulness and reasonableness when considered in the light of his findings and the evidentiary facts upon which they rest. If it becomes impossible for us properly to carry out our obligation by reason of his failure to set forth in his decision the facts he has found and the reasons for his conclusions, we will not make original findings of fact or fix the relief required, but instead will remand the case and afford the administrator an opportunity to fulfill his obligation in a supplementary or additional decision. *New England Tel. & Tel. Co.* v. *Kennelly, supra.*

Having stated the fundamental rules which guide us, we turn to the merits.

### The Company's Appeal

At the hearing before the administrator the Company presented a statement of its operating revenues and expenses for the six-months period preceding the filing of its petition as well as a projection of what those revenues and expenses would be for the twelve-months period from August 1, 1964 to July 31, 1965. The estimates for the twelve-months period, hereinafter referred to as the "base period," were made on the assumption that existing services would continue. Both the actual and the projected statements indicated that neither the prescribed operating ratio nor the fixed minimum return had been or could be maintained or secured. In addition, the Company proposed specific relief which would enable it to maintain an operating ratio of 91.97 per cent.

The administrator, while in substantial agreement with the Company's estimates of its anticipated operating revenues and expenses for the base period, added to the former and reduced the latter. Premised upon the estimated operating totals as adjusted by him, he granted relief to a lesser degree than proposed by the Company but sufficient to enable it to achieve an operating ratio of 93.24 per cent for

the base period. Specifically, he authorized the Company to abandon all operations within the Woonsocket division and on three suburban lines within the Elmwood division, to reroute certain lines as proposed and to eliminate service on Sundays and holidays in the Pawtucket division. He denied, however, the request for a fare increase, and refused to authorize either an abandonment of all service within the Pawtucket division or an elimination of Sunday and holiday service within the Elmwood division.

The Company charges that additions made by the administrator to its estimates of operating revenues to the extent of $102,000 were not properly attributable thereto and that it was improper for him to reduce its projected operating expenses by $41,000. It argues that the degree of relief granted is so limited that any error in the administrator's computations will make impossible the maintenance during the base period of either the prescribed operating ratio or the fixed minimum return on its rate base. Because the administrator does not dispute this contention as to the limitations of the degree of relief granted, we will pass separately on each of the challenges advanced by the Company to the adjustments made by him.

### Income Attributable to the Intercorporate Relationship

The United Truck & Body Company was organized three or four years ago as a wholly-owned subsidiary of the Company. It owns and operates school buses under contracts with various local communities, sells trucks, truck parts and accessories, and ostensibly conducts a truck repair service. Its operating capital, or at least a substantial part thereof, came from the Company which at the end of May 1964 had an "investment" in it of $440,000 consisting of $150,000 in capital stock, $146.000 in interest-bearing notes, and $144,-000 on open account. The interest-bearing notes apparently represent advances made by the Company to the sub-

sidiary for the purchase of school buses and, under the accounting practices of the two corporations, is charged by the subsidiary as a cost of its school bus rental division, and is classified by the Company as "Other Income" rather than as operating revenue.

To some extent the two companies share personnel. Policy decisions of the subsidiary are made by the Company's president. A Company vice-president is in effect in charge of its operations and other Company personnel contribute time to its operations. The president receives all of his compensation from the Company and the vice-president receives $10,000 each year from the Company and $800 from the subsidiary. Other employees are paid by the Company which in turn collects from the subsidiary a just proportion of their salaries or wages. It makes no contribution, however, to the overhead expenses allocable to the other employees.

The relationship between the two companies as concerns the subsidiary's truck repair service is unusual. The subsidiary has contracted to repair and service various fleets of trucks but, instead of doing the work itself, subcontracts it to the Company. The Company's profit projected for the base period for such work is $36,000 and the subsidiary on the calendar-year basis will profit therefrom by $39,160. The Company classifies what it will receive as "Net Income From Non-carrier Operations" rather than as revenue from operations. In addition, Company personnel does the repair work on the subsidiary's school buses on a nonprofit basis, the Company receiving only enough to equal its "out-of-pocket cost." This manner of doing business is explained by the Company as having been adopted in order to provide a means whereby its garage facilities may be more fully utilized and some of its service personnel, who otherwise would be dismissed for lack of work, retained on its payroll.

The administrator found that the operations of the two

companies were "intertwined," that the subsidiary realized profits because of a "favorable relationship" with the Company, and he concluded that for rate purposes he should "pierce the corporate veil * * *." He included the subsidiary's net profit estimate of $55,000 for the base period as part of the Company's operating revenues and in addition reclassified to that account both the $11,000 received by the Company as interest on the promissory notes and the estimated profit of $36,000 to be realized by the Company from its performance of the subsidiary's truck repair contracts. The Company argues that it was error to disregard as fiction the separate corporate identity of the subsidiary, and further that in any event it was illegal and unreasonable to have considered such amounts as operating revenues.

The initial question is whether the administrator erred when he disregarded the corporate entity of the subsidiary and treated it as though it were an adjunct of the Company. So far as we are able to ascertain, and the administrator does not contend otherwise, there is nothing in the general or special laws under which the Company operates which inhibits ownership by it of all of the stock of a subsidiary. The question then is to be decided under general principles of corporation law.

We pointed out in *Vennerbeck & Clase Co.* v. *Juergens Jewelry Co.,* 53 R. I. 135, 139, that cases involving the relationship between shareholders and corporation are akin to but different from those where the relationship is between a corporation and its subsidiary. In the former the corporate entity is disregarded and will be considered as though an association of persons if it is used to defeat public convenience, justify wrong, protect fraud, or defend crime or work an injustice. See also *Muirhead* v. *Fairlawn Enterprise, Inc.,* 72 R. I. 163, and *Arch Lumber Co.* v. *Archibald,* 88 R. I. 49. In the latter the identity of the subsidiary is ignored when "it is so organized and con-

trolled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation." 1 Fletcher, Cyclopedia Corporations (perm. ed.) §43, p. 203; *Chicago, Milwaukee & St. Paul Ry.* v. *Minneapolis Civic & Commerce Ass'n*, 247 U. S. 490; *United States* v. *Reading Co.*, 253 U. S. 26, 63; *Charles E. Austin, Inc.* v. *Secretary of State*, 321 Mich. 426, 434; *Mueller* v. *Seaboard Commercial Corp.*, 5 N. J. 28, 34.

The Company in substance contends that its ownership of all of the capital stock of the subsidiary even when coupled with joint management does not create such an identity of corporate interest between the two as to justify a disregard of the separate existence of the subsidiary. We agree that the authorities support that position. *Lowell Gas Co.* v. *Department of Public Utilities*, 324 Mass. 80; *Berkey* v. *Third Avenue Ry.*, 244 N. Y. 84; *Superior Coal Co.* v. *Department of Finance*, 377 Ill. 282; 1 Fletcher, *supra*, p. 206. We must look, however, at the totality of the circumstances surrounding the relationship and determine whether in the light thereof, as the court said in *Chicago, Milwaukee & St. Paul Ry.* v. *Minneapolis Civic & Commerce Ass'n, supra*, at page 501, the "stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company * * * * ."

Here, when we consider all the circumstances, we find that the subsidiary is engaged in the highly profitable venture of providing bus transportation for school children notwithstanding that the Company itself engages in the charter bus service. As to that service the Company provides the subsidiary with management service without receiving in return an aliquot share of the cost, furnishes it with capital funds on only a relatively small portion of

which it receives a return and repairs on its premises and with its personnel the school buses without reward other than a recapture of its out-of-pocket expenses. In addition, the subsidiary serves merely as a conduit through which the truck repair service work passes on its way to performance by the Company. If the school bus operation and the truck repair service were inconsequential parts of the subsidiary's operations, they might be disregarded, but they assume paramount importance when it appears that of its projected gross earnings of $113,470 for the calendar year 1964, $67,310 will come from the school bus operation, $39,160 from the truck service department, and only $7,000 from all other segments of its business.

In our opinion, the substance of the relationship between the two corporations is such that we cannot say that the administrator acted either illegally or unreasonably when he found in effect that the identity of the subsidiary had been merged with that of the parent.

The Company further argues, however, that the interest received on the subsidiary's promissory notes, the subsidiary's net operating profit, and the Company's profit arising from the services performed in the repair of trucks are unrelated to its operation of a public transportation service and should not for rate-making purposes be considered as operating revenues. The term "operating revenues" is used in sec. 7(b) where operating ratio is defined "as the ratio of all reasonable and prudent operating expenses * * * to *operating revenues.*" (italics ours) The Company, in substance, asks us to construe that term as though it read "operating revenues received in the public transportation service." In construing the statute, however, the words must be given their plain meaning unless a contrary intention appears, and if the words are neither equivocal nor ambiguous we do not interpret or extend them but apply them literally. *United Transit Co.* v. *Hawksley,* 86 R. I. 53; *Irish* v. *Collins,* 82 R. I. 348; *State* v. *Nadeau,* 81 R. I. 505.

Here, application of the plain meaning test requires that there be included in "operating revenues" the results of the sale of goods and the rendering of services. This is not only the ordinary meaning, but is in accord with the generally accepted definition given to the word "revenue" in the field of accounting. Wixon, Accountants' Handbook (4th ed.) sec. 5, p. 1.

Once the separate corporate identity of the subsidiary is disregarded and the operations of the two corporations merged, operating revenues, as we have construed that term, include the interest income of $11,000, the truck repair service profit, and the $55,000 which the subsidiary now treats as net profit from operations. The administrator did not exceed the bounds of what is either legal or reasonable when he added these items to the Company's estimate of operating revenues.

EXPENSES FOR INJURIES, DAMAGE CLAIMS AND INSURANCE

The Company attacks the administrator's deduction of $10,000 from the amount projected by it as a reserve fund for its claims department. It appears that the Company each month sets aside 4 per cent of its operating revenues as a reserve fund to cover the anticipated costs of the administration of its claims department and for the payment of damage and workmen's compensation claims. Based upon experience and estimates as to potential liabilities on unsettled claims, the reserve fund is adjusted on an annual basis and excesses are credited and deficiencies debited to earned surplus. In addition, dividends received on account of group insurance are credited to earned surplus.

The administrator had before him an exhibit detailing the results of the application of the foregoing procedures for a period of nine years. It discloses that during that period credits from the reserve fund to surplus exceeded the debits to that account by an average of approximately $10,000 a year, and premised upon that experience the administrator concluded that the Company had over-

estimated its expenses in this area for the base period by that amount.

In these circumstances we cannot say that the administrator acted either illegally or unreasonably when he made this deduction from the Company's projected operating expenses.

EXECUTIVE SALARIES, EXPENSE ACCOUNTS & LEGAL FEES

The administrator found that the amount projected by the Company for executive salaries, expense accounts and legal fees was unreasonable and he deducted $25,000 from its estimate of operating expenses. His reason was that increases in general and administrative expenses were not appropriate to a Company whose operations were contracting.

We do not question his authority to determine that the estimated expenses in these areas were unreasonable. but in order to enable us to pass on his conclusion that the amount projected was unreasonable and imprudent, we are required to know, for example, what portion of the total deduction he allocated to each of the three accounts, the nature and the quality of the services to be rendered by each of the executive officers, the legal work reasonably to be anticipated, the necessity of the expense accounts, and which of the officers are to be paid unreasonably excessive salaries and by what amounts. In short, in order to pass on reasonableness, we must be advised as to those circumstances which are relevant under recognized standards to a determination of what is a reasonable salary, or legal fee, or expense account. Because we lack that information we are unable to determine either the fair value of the estimated executive salaries and legal fees or the legitimacy of the expense accounts.

Ordinarily, the determination of what shall be expended in the areas under consideration is a function of management and should not be interfered with absent evidence tending to prove that the projected expenditures unreason-

ably and unjustly affect the fare-paying public. *Narragansett Electric Co.* v. *Kennelly*, 88 R. I. 56, 86. While the Company may owe an obligation to the fare-payers "to pare these expenses as the system shrinks," a conclusion that they are unreasonable and unjust grounded solely on that reason constitutes an invasion of the office of the Company's board of directors and an unwarranted invasion into the field reserved to management.

For the reasons indicated, we hold that the administrator acted arbitrarily when he deducted $25,000 from the estimated general and administrative expenses and a remand is required. The administrator in any supplementary decision should advert to circumstances in addition to the Company's contracting operations which lend support to the conclusion that the estimated expenses in these areas are unreasonable.

CHARITABLE CONTRIBUTIONS

The Company in its projection for the base period included as an operating expense $6,000 for charitable contributions which the administrator eliminated. He reasoned that when a public utility is in "dire financial circumstances" and is suffering "diminishing operations" its shareholders rather than the fare-paying public should sustain the burden of its charitable donations.

The authorities are not in accord as to whether a gift to a charity by a public utility is properly chargeable as an operating expense. The minority hold that to allow such a gift as an expense of operations constitutes an involuntary levy on the rate payers and should not be permitted. *Chesapeake & Potomac Tel. Co.* v. *Public Service Comm'n*, 230 Md. 395; *Carey* v. *Corp Comm'n*, 168 Okla. 487.

In our opinion, however, the better and apparently the majority rule is that a gift by a public utility to a charitable organization in modest amount may be charged as an operating expense provided it is first established that it is pro-

514

ductive of good community relations which will benefit the utility or its patrons. *New Jersey Bell Tel. Co.* v. *Department of Public Utilities,* 12 N. J. 568, 596; *Application of Diamond State Tel. Co.,* 51 Del. 525, 536.

Because we adopt the majority rule, a remand becomes necessary in order to permit the administrator to ascertain from the record whether the Company has established that the charitable gifts it has projected will so benefit the Company or its patrons as to qualify for inclusion as operating expenses.

### Marlene K. Smith's Appeal

Marlene K. Smith, a resident of the city of Woonsocket who is employed in the city of Providence, prosecutes her appeal under authority of G. L. 1956, §39-5-1. She raises the question of whether that portion of sec. 7(a) which provides that the administrator may "allow the company to reduce bus miles operated on nonprofitable routes or any portion thereof" confers jurisdiction on him to permit an abandonment of all operations within the Woonsocket division and on three suburban lines within the Elmwood division.

Her contention is that the power to allow a *reduction in mileage* operated on nonprofitable routes is sufficient only to permit a decrease in the volume on those routes or a diminution of the number of runs thereon. She argues that the administrator exceeded the legitimate bounds of his authority under sec. 7(a) when he permitted the Company to terminate all operations on these routes.

The legislature, in amending the charter of the Company by enacting chap. 144, declared that it was essential to the public welfare that the Company continue in existence to the end that the citizens of this state might continue to enjoy the essential public transportation services which it provided. Recognizing that a financially healthy company is a prerequisite to the accomplishment of the declared

purposes, the legislature further provided the means whereby through administrative action the Company might be assured, under sec. 7, of a net operating income and, under sec. 8 of chap. 144, of an unimpaired credit.

Here the Company, finding itself unable to maintain its net operating income at the minimum level contemplated by the legislature as being necessary for survival, petitioned for relief under sec. 7(a). On the establishment of the condition precedent the administrator was mandated to allow either a fare revision, or a reduction in miles operated on unprofitable routes or portions thereof, or a combination of fare revisions and mileage reductions. Upon a different showing, the Company could have proceeded under sec. 8. That section in pertinent part vests the administrator with authority to permit the Company to *curtail, eliminate* or *abandon* any scheduled route or run or separable portion thereof when the revenue collected therefrom "does not substantially equal the out-of-pocket operating costs incurred with respect to such route or run or portion thereof, and is causing an unwarranted impairment of the company's credit * * *."

The differences in secs. 7 and 8 as to the conditions which must obtain before the administrator may act and the manner of relief within his power to permit are not without significance, particularly when considered in the framework of the declared legislative purpose and objective of insuring a continued operation of the public transportation system for the benefit of the citizens of this state.

To allow an abandonment of all operations on a route is to deny the benefits of public transportation to some of our citizens. It is drastic relief. It may be allowed only when specifically authorized. It is permitted under sec. 8 upon the establishment of the condition precedent therein provided. To read a power to permit an abandonment into that portion of sec. 7 which allows a reduction of mileage operated on a nonprofitable route is to extend arbitrarily

the plain meaning of the words "to reduce" and to defeat the clearly defined legislative plan. This we will not do. *Carlson* v. *McLyman,* 77 R. I. 177.

For the foregoing reasons, we hold that the administrator acted in excess of the jurisdiction conferred on him under sec. 7 when he allowed the Company to abandon all operations within the Woonsocket division and on three suburban lines within the Elmwood division.

## CONCLUSION

In the circumstances a remand is necessary and the administrator should be given an opportunity to file an additional or supplementary decision. In that decision he should, to the extent that they may be disclosed in the record, inform us of the evidentiary facts which, in accordance with this opinion, are relevant to the propriety of the Company's estimated charitable contributions and to the reasonableness of its projected general and administrative expenses. If the record does not contain any such facts, his order should be so amended as to grant relief to the Company to the degree contemplated by sec. 7.

Additionally, his order should be amended by allowing in lieu of the abandonment of all service within the Woonsocket route and on the three suburban lines within the Elmwood division, such revision in the Company's fare structure, or such reduction in the bus miles operated on nonprofitable routes or any portion thereof, or such combination of fare revisions and mileage reductions in a manner and to the degree that will enable the Company to maintain an operating ratio not in excess of 94 per cent or to secure a rate of return on its base rate of at least 5 per cent for the twelve-months period commencing as of August 1, 1964.

Pending the filing of such supplementary decision and amended order, the order attached to the administrator's decision may remain in effect. We take this action in recog-

nition of the possibility that any interim resumption of service on the routes permitted to be abandoned might threaten the financial stability and continued existence of the Company, conditions which the legislature sought to guard against when it enacted chap. 144. In the circumstances, however, it is appropriate that the administrator file his supplementary decision and order with all reasonable dispatch.

In *Santos* v. *Smith,* 99 R. I. 430, 208 A.2d 524, we called attention to the statutory procedure provided in G. L. 1956, chap. 35 of title 42, the Administrative Procedures Act, for judicial review of administrative proceedings. We note the possible application of that statute to these proceedings. For the reasons given in that case, we do not raise sua sponte the question of whether the enactment of that statute vested the superior court with exclusive jurisdiction to review this order. Our failure to do so, however, should not be deemed precedential.

In each case the record certified to this court is ordered returned to the respondent public utility administrator for the purpose of affording him an opportunity to clarify and complete his decision and amend his order in accordance with this opinion. Jurisdiction for review of his supplementary decision and amended order is retained in this court.

*Armstrong, Gibbons & Lodge, Walter F. Gibbons, Joseph G. Kinder,* for petitioner United Transit Company.

*Abraham Goldstein,* for petitioner Marlene K. Smith.

*J. Joseph Nugent,* Attorney General, *Joseph L. Breen,* Chief Special Counsel, for respondent.