401 A.2d 440.

# D & J Enterprises, Inc. *et al. vs.*
# Julius C. Michaelson, *Attorney General et al.*

MAY 14, 1979.

Present: Joslin, Kelleher, Doris and Weisberger, JJ.

JOSLIN, J.   This is a petition filed in the Superior Court under the Uniform Declaratory Judgments Act.[1] It seeks a declaration of the constitutionality of this state's obscenity statute, G.L. 1956 (1969 Reenactment) §§11-31-1 to 13, as amended by P.L. 1978, ch. 218 (the Act), that subjects to criminal punishment anyone who willfully or knowingly promotes obscene material for the purpose of commercial gain. It also seeks an injunction prohibiting the respondents from procuring any information or indictment against the petitioners and from arresting them for alleged violations of the Act. The parties filed an agreed statement of facts in the Superior Court and the case was then certified[2] to this court for hearing pursuant to §9-24-25.[3]

According to the agreed statement of facts, the petitioners are "business entities and individuals which own and operate bookstores within the State of Rhode Island that sell books, magazines and films, and also provide opportunity for

---

[1]G.L. 1956 (1969 Reenactment) ch. 30 of tit. 9.

[2]In *Sweeney* v. *Notte*, 95 R.I. 68, 73-74, 183 A.2d 296, 299 (1962), we expressed doubt about the propriety of the Superior Court's invocation of the certification procedures of G.L. 1956 (1969 Reenactment) §9-24-27 in a proceeding brought under the Uniform Declaratory Judgments Act. Whether similar doubts exist about combining the certification procedures of §9-24-27 in a proceeding brought under the Uniform Declaratory Judgments Act. Whether similar doubts exist about combining the certification procedures of §9-24-25 with a petition for a declaratory judgment is a question which the parties did not discuss and which we do not raise on our own motion.

[3]General Laws 1956 (1969 Reenactment) §9-24-25 provides:

"Whenever any civil action, legal or equitable in character, is pending in a district court or in a superior court, and the parties shall file in the clerk's office an agreed statement of facts in such action, the court shall certify the action to the supreme court to be there heard and determined. After having decided the action the supreme court shall send back the papers therein, with its decision certified thereon, to the court from which the action was certified, which shall enter final judgment upon the decision."

viewing films on their premises in private booths, which books, magazines have sexual themes and often describe or visually depict nude persons engaging in various forms of sexual activity * * *." The named respondents are the state Attorney General and the police chiefs of both Providence and West Warwick, but the only respondent to file a brief and argue was the Attorney General.

The statement of facts further indicates that the Providence police chief has publicly vowed to enforce the challenged Act "vigorously with the objective of ridding Providence of what he consider[s] to be 'pornographic' material"; that "[d]etectives of the Providence Police Department made visits to the bookstores of all the [petitioners] who have bookstores in Providence and indicated to the personnel of those bookstores that it was their intention to ultimately terminate the sale and display of what they believed to be 'pornographic' materials"; and, finally, that West Warwick police officers arrested an officer and an employee of one of the corporate petitioners and charged each of them with violation of §11-31-1 of the Act.

The challenged Act was enacted in response to the United States Supreme Court's decision in *Miller* v. *California,* 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), and it is against the constitutional standards laid down in *Miller* that the Act must be measured. In that case, the Court refined the legal definition of obscenity that had emerged from *Roth* v. *United States,* 354 U.S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957) and *Memoirs* v. *Massachusetts,* 383 U.S. 413, 86 S. Ct. 975, 16 L. Ed. 2d 1 (1966). Besides rejecting the unworkable *Roth-Memoirs* requirement that, to be legally obscene, a work must be utterly without redeeming social value, the *Miller* Court set out a new framework of revised standards to guide the states in separating what is obscene, and therefore subject to governmental regulation, from what is not obscene, and therefore constitutionally protected from

all but the most minimal governmental interference.[4] 413 U.S. at 24-25, 93 S. Ct. at 2615, 37 L. Ed. 2d at 431. Because obscenity is not within the area of speech protected by the first and fourteenth amendments, *Kois* v. *Wisconsin,* 408 U.S. 229, 230, 92 S. Ct. 2245, 2246, 33 L. Ed. 2d 312, 314-15 (1972); *Roth* v. *United States,* 354 U.S. at 485, 77 S. Ct. at 1309, 1 L. Ed. 2d at 1507,[5] it was necessary to define it carefully in order to separate it from matter which is sexually oriented, but not obscene, and is therefore fully protected expression. *Miller* v. *California,* 413 U.S. at 23-24, 93 S. Ct. at 2614, 37 L. Ed. 2d at 430. What emerged was a new constitutional blueprint with specific guidelines for isolating "hard core" pornography from protected expression.

In fashioning that blueprint, the *Miller* Court held that:

"[s]tate statutes designed to regulate obscene materials must be carefully limited. [citation omitted] As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed." *Id.* at 23-24, 93 S. Ct. at 2614-15, 37 L. Ed. 2d at 430.

Further, the Court emphasized that the determination of what is obscene is the province of the jury, and announced that:

---

[4] *See* Schauer, *Reflections on "Contemporary Community Standards": The Perpetuation of an Irrelevant Concept in the Law of Obscenity,* 56 N.C. L. Rev. 1, 4 (1978).

[5] Obscenity is not within the protected area because it is not considered speech at all, or because, although speech, its communicative aspect is utterly without social value. *See Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 571-72, 62 S. Ct. 766, 769, 86 L. Ed. 2d 1031, 1035 (1942), where the Court noted:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene * * *. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

"The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, [citation omitted] (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* at 24, 93 S. Ct. at 2615, 37 L. Ed. 2d at 431.

In drafting the Rhode Island statute, the Legislature was clearly guided by *Miller;* indeed, some of the statutory language quotes *Miller* verbatim. Intention alone, however, does not insure a constitutional result. In challenging the Act's constitutionality, petitioners contend that §11-31-1, "endeavors to follow the standards for regulating obscenity outlined in *Miller* * * * but falls short of the mark in that it creates a *per se* rule defining exactly what is obscene, or 'patently offensive sexual conduct,' rather than allowing the trier of fact to measure an individual work in question against 'contemporary community standards' in order to reach a specific conclusion in a particular matter."[6] The petitioners reach this conclusion because the words "sexual conduct" are preceded by the modifier "patently offensive," and they contend that the Legislature has thus determined that the various types of sexual conduct included in the list that follows the phrase are, by definition, patently offensive.

The Attorney General agrees that, under *Miller,* resolution of the highly sensitive question of whether a representation of sexual conduct is patently offensive is within the factfinder's

---

[6]The petitioners also challenge the statute as violative of the equal protection of the law guaranteed by the fourteenth amendment to the United States Constitution because G.L. 1956 (1969 Reenactment) §11-31-15, which was not amended by P.L. 1978, ch. 218, exempts motion picture operators and their assistants, but does not exclude similarly situated bookstore clerks; and also because it violates the right to private possession of obscene material announced in *Stanley* v. *Georgia*, 394 U.S. 557, 89 S. Ct. 1243, 22 L. Ed. 2d 542 (1969), as it may prohibit the rental of private booths for viewing peep shows.

discretion.[7] *See* 413 U.S. at 26, 93 S. Ct. at 2616, 37 L. Ed. 2d at 432. He argues, however, that the Act, properly construed, does not restrict the jury from fulfilling that obligation. To evaluate these conflicting positions, we start with an examination of the language of the Act itself. The pertinent part of §11-31-1 provides that:

> " 'An obscene work' is a work which taken as a whole appeals to prurient interest in sex, which portrays sexual conduct in a patently offensive way, and which, taken as a whole, does not have serious value. In determining whether or not a work is an obscene work the trier of fact must find (a) that the average person, applying contemporary community standards find[s] that the work, taken as a whole appeals to the prurient interest and (b) that the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by this chapter or authoritatively construed by the courts of this state as being a portrayal of patently offensive sexual conduct as that phrase is used in the definition of an obscene work and (c) that the work, taken as a whole, lacks serious value.

> \* \* \*

> "The phrase *'patently offensive sexual conduct'* shall be deemed to include any of the following described sexual conduct:

---

[7]The factfinder's discretion, however, is not "unbridled," and is limited in part by *Miller*'s requirement that targeted conduct be adequately defined by state law. In *Jenkins* v. *Georgia*, 418 U.S. 153, 160, 94 S. Ct. 2750, 2755, 41 L. Ed. 2d 642, 650 (1974), the Court said:

> "Even though questions of appeal to the 'prurient interest' or of patent offensiveness are 'essentially questions of fact,' it would be a serious misreading of *Miller* to conclude that juries have unbridled discretion in determining what is 'patently offensive.' Not only did we there say that 'the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary,' [citation omitted] but we made it plain that under that holding 'no one will be subject to prosecution for the sale or exposure of obscene materials unless those materials depict or describe patently offensive "hard core" sexual conduct \* \* \*'."

"(a) An act of sexual intercourse, normal or perverted, actual or simulated including genital-genital, anal-genital, or oral-genital intercourse, whether between human beings or between a human being and an animal.

"(b) Sado-masochistic abuse, meaning flagellation or torture by or upon a person who is nude or clad in undergarments or in a revealing costume or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed, in an act of apparent sexual stimulation or gratification.

"(c) Masturbation, excretory functions and lewd exhibitions of the genitals, including any explicit, closeup representation of a human genital organ or spread-eagle exposure of female genital organs." (Emphasis added.)

In adopting the challenged phraseology, the Legislature obviously did more than simply catalog what kinds of sexual conduct, if described or depicted in a work or show, may be subjected to a jury's scrutiny and possibly found obscene.[8] Had it merely compiled such a list and then allowed the factfinder to decide whether the targeted conduct is not only sexual, but also patently offensive, it might have structured a properly limited regulatory scheme, because *Miller* directs that the kind of conduct that may be subject to regulation "must be specifically defined by the applicable state law." 413 U.S. at 24, 93 S. Ct. at 2615, 37 L. Ed. 2d at 430.

By defining the broader concept of "patently offensive sexual conduct," rather than the narrower term "sexual conduct," however, the Legislature established a conclusive

---

[8]It should be noted that the construction " 'patently offensive sexual conduct' shall be deemed to include ＊ ＊ ＊" differs radically in meaning from the language of the two examples of regulable conduct cited in *Miller*. That case lists as regulable "[p]atently offensive representations or descriptions of [listed conduct]." *Miller* v. *California*, 413 U.S. 15, 25, 93 S. Ct. 2607, 2615, 37 L. Ed. 2d 419, 431 (1973). The construction in our statute answers the question, "What is patently offensive sexual conduct?" The answer is — the list that follows. The construction in *Miller* answers the question, "What kind of representation of the listed conduct is regulable?" The answer is — only those representations that a jury finds to be patently offensive.

presumption and predetermined that the average person, applying contemporary community standards,[9] would find such conduct patently offensive. This predetermination makes it impossible for juries hearing different cases that involve representations of identical sexual conduct to reach different results about whether they are patently offensive.[10] The Legislature has thus encroached upon the exclusive province of the jury, a representative body that is

> "entitled to draw on [its] own knowledge of the views of the average person in the community or vicinage from which [it] comes for making the required determination, just as [it] is entitled to draw on [its] knowledge of the propensities of a 'reasonable' person in other areas of the law." *Hamling* v. *United States*, 418 U.S. 87, 104-05 94. S. Ct. 2887, 2901 41 L. Ed. 2d 590, 613 (1974). *See also Smith* v. *United States*, 431 U.S. 291, 302, 97 S. Ct. 1756, 1764, 52 L. Ed. 2d 324, 336 (1977).

In sum, the Legislature has included in its definition of "patently offensive sexual conduct," conduct that a jury, in the light of its own understanding of contemporary community standards, might *not* find patently offensive. In so doing, it has reached conduct that may be protected by the Consti-

---

[9]The Act defines the relevant community as the State of Rhode Island. General Laws 1956 (1969 Reenactment) §11-31-1, as amended by P.L. 1978, ch. 218. As the Supreme Court noted in *Smith* v. *United States*, 431 U.S. 291, 303, 97 S. Ct. 1756, 1765, 52 L. Ed. 2d 324, 336-37 (1977), a state may "impose a geographic limit on the determination of community standards by defining the area from which the jury could be selected in an obscenity case, or by legislating with respect to the instructions that must be given to the jurors in such cases." *See also Jenkins* v. *Georgia*, 418 U.S. 153, 157, 94 S. Ct. 2750, 2753, 41 L. Ed. 2d 642, 648 (1974). National standards are not required. *Miller* v. *California*, 413 U.S. 15, 30-34, 93 S. Ct. 2607, 2618-20, 37 L. Ed. 2d 419, 434-36 (1973).

[10]In *Roth* v. *United States*, 354 U.S. 476, 492 n.30, 77 S. Ct. 1304, 1313 n.30, 1 L. Ed. 2d 1498, 1511 n.30 (1957), the Court said, "it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system."

tution because it is not legally obscene. A statute permitting that result is overbroad and does not pass constitutional muster.[11]

The Attorney General, however, takes issue with a construction requiring this conclusion; and he argues that, although the provision just discussed may be read to remove the determination of what is patently offensive from the trier of facts, §11-31-1, read in its entirety, rather than in fragments, is at least reasonably susceptible of the opposite construction. He further argues that because the language may be read in different ways, we should adopt a construction that is constitutional, rather than one which results in a declaration of unconstitutionality.

The Attorney General's position is based on the assumption that the preference for constitutionality is applicable even in the sensitive area of first amendment rights. The "inherent dangers of undertaking to regulate any form of expression," noted in *Miller*, 413 U.S. at 23, 93 S. Ct. at 2614, 37 L. Ed. 2d at 430, however, demand a cautious approach, and may require strict construction of a statute that possibly impinges on first amendment freedoms.[12] Furthermore, even

---

[11]It should be emphasized that the statute is overbroad not because of the particular types of conduct listed, but because those types of conduct are conclusively designated "patently offensive." As examples of types of conduct, depictions or descriptions of which a state obscenity statute may target for regulation, *Miller* cites the definitions in Or. Rev. Stat. §167.060 (1971), and Haw. Pen. Code §712-1210 (1972). *Miller* v. *California*, 413 U.S. 15, 24, n.6, 93 S. Ct. 2607, 2615 n.6, 37 L. Ed. 2d 419, 430 n.6 (1973). There are, of course, "substantive constitutional limitations, deriving from the First Amendment," on the type of material that may be submitted to a jury for a determination of patent offensiveness. *Jenkins* v. *Georgia*, 418 U.S. 153, 160, 94 S. Ct. 2750, 2755, 41 L. Ed. 2d 642, 650 (1974).

[12]That the presumption of constitutionality may not apply where legislation appears facially to violate a specific constitutional provision was first noted in *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152 n.4, 58 S. Ct. 778, 783 n.4, 82 L. Ed. 1234, 1241-42 n.4 (1938). This position was elaborated in the first amendment area in Mr. Chief Justice Stone's dissent in *Jones* v. *Opelika*, 316 U.S. 584, 608, 62 S. Ct. 1231, 1244, 86 L. Ed. 1691, 1707 (1942). On the preferred position of first amendment rights in statutory construction, *see United States* v. *Congress of Industrial Organizations*, 335 U.S. 106, 140-41, 68 S. Ct. 1349, 1366, 92 L. Ed. 1849, 1870-71 (1948) (Rutledge, Black, Douglas, Murphy, JJ., concurring); *Marsh* v. *Alabama*, 326 U.S. 501, 509, 66 S. Ct. 276, 280, 90

were we to accept the Attorney General's position that the presumption applies in a case like this, it would be operative only if the language of the section at issue were ambiguous and demanded construction. *See State* v. *Authelet,* 120 R.I. 42, 385 A.2d 642, 647 (1978).

There is nothing ambiguous, however, in the statement "[t]he phrase 'patently offensive sexual conduct' shall be deemed to include any of the following described sexual conduct." That language, as we have already observed, does no more than define what is "patently offensive sexual conduct," and has but a single, plain meaning.

The only possible ambiguity in the statute arises from an apparent clash between the per se definition of what sexual conduct is patently offensive and the language in the first paragraph of §11-31-1, defining an "obscene work." The Legislature there provided that the factfinder can conclude that a work is obscene only if it finds, *inter alia,* "(b) that the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by this chapter or authoritatively construed by the courts of this state *as being a portrayal of patently offensive sexual conduct as that phrase is used in the definition of an obscene work."* (Emphasis added.) The language preceding the italicized portion is almost a direct quotation of part (b) of *Miller's* basic guidelines which are set out in full at p. 5, *supra,* and does indicate, as the Attorney General asserts, that the determination of patent offensiveness lies with the jury. Rather than stopping where the *Miller* Court did, however, the Legislature added the italicized language. That addition is not merely excess verbiage. It was included for a purpose, and in our judgment that purpose was to incorporate into the standard the Legislature's definition of the phrase "patently offensive sexual conduct."

L. Ed. 2d 265, 270 (1946); *Thornhill* v. *Alabama,* 310 U.S. 88, 95-96, 60 S. Ct. 736, 740-41, 84 L. Ed. 1093, 1098-99 (1940); *First Nat'l Bank of Boston* v. *Attorney General,* 362 Mass. 570, 586-87, 290 N.E.2d 526, 537 (1972); *Johnson* v. *State Civil Service Department,* 280 Minn. 61, 66, 157 N.W.2d 747, 751 (1968); 2A Sutherland, *Statutes & Statutory Construction* §45.11 at 35 n.1 (4th ed. Sands 1973); McKay, *The Preference for Freedom,* 34 N.Y.U. L. Rev. 1182, 1212-13 (1959).

The additional language is clearly referable only to that definitional section, and the difference is critical. Although the wording is unartful, the Legislature's reworking of part (b) of the *Miller* guidelines, when read in conjunction with the language defining the phrase "patently offensive sexual conduct," leaves no doubt that the plain meaning of both is to set off certain conduct as not only sexual and thus subject to regulation, but also as patently offensive. As we have already observed, such a result is impermissible. Consequently, even if the Legislature intended to conform its second standard to part (b) of the *Miller* guidelines, it clearly did not succeed. We are not at liberty to redraft a statute that has a single, plain meaning. *See, e.g., Berberian v. Town of Westerly,* 119 R.I. 593, 597, 381 A.2d 1039, 1042 (1978); *Podboroski v. William H. Haskell Manufacturing Co.,* 109 R.I. 1, 8, 279 A.2d 914, 918 (1971); *United Transit Co. v. Nunes,* 99 R.I. 501, 510, 209 A.2d 215, 220-21 (1965); *Cataldo v. Pono,* 89 R.I. 240, 242, 152 A.2d 98, 99 (1959).

The Act therefore fails to meet the *Miller* blueprint, and must be stricken as constitutionally overbroad. Because it improperly defines what constitutes an "obscene work" (the essential subject matter of the Act), the entire Act must fall. Therefore, we do not reach the petitioners' other constitutional challenges.

The papers in the case, with our decision certified thereon, are ordered to be remanded to the Superior Court for entry of final judgment upon the decision.

Mr. Chief Justice Bevilacqua did not participate.

*McKinnon & Fortunato, Stephen J. Fortunato, Jr.,* for petitioners, *DiSandro Associates, Guy R. Bissonnette, Sandra Blanding,* (for Amicus Curiae, The Rhode Island Affiliate of the American Civil Liberties Union).

*Dennis J. Roberts II,* Attorney General, *Allen P. Rubine,* Assistant Attorney General, *John S. Foley,* Special Assistant Attorney General; for respondents. *Nugent & Nugent, J.*

*Joseph Nugent, Jr.,* (for Harold E. Doran), *John S. Brunero,* Town Solicitor, West Warwick, (for William A. Gallucci), *Ronald H. Glantz,* City Solicitor, Providence, (for Angelo Ricci), *Joseph A. Rotella,* Assistant City Solicitor, Providence, (for Angelo Ricci): [for Amici Curiae].