**TOWN OF NEW SHOREHAM**

v.

**Edward F. BURKE.**

**BLOCK ISLAND POWER COMPANY**

v.

**Edward F. BURKE.**

**TOWN OF NEW SHOREHAM**

v.

**PUBLIC UTILITIES COMMISSION et al.**

**Nos. 85–358–M.P., 85–378–M.P. and 85–382–M.P.**

Supreme Court of Rhode Island.

Jan. 15, 1987.

Elliot Taubman, Block Island, Lawrence Pomeroy, Newport, pro hac vice, for Town of New Shoreham.

Peter V. Lacouture, Tillinghast Collins & Graham, Providence, for Block Island Power Co.

Arlene Violet, Atty. Gen., Sheldon Whitehouse, Sp. Asst. Atty. Gen., for defendant.

## OPINION

MURRAY, Justice.

These cases, having been argued on a consolidated basis,[1] are before the court on a petition for a statutory writ of certiorari filed by Block Island Power Company (the company) from the Public Utilities Commission's Twelfth Compliance Report and Order (twelfth order), dated August 13, 1985. This matter is also before the court on a petition for a statutory writ of certiorari filed by the town of New Shoreham (the town), claiming error regarding two incidental aspects of said order. The company seeks reversal of the twelfth order, which requires the company to purchase fuel from suppliers other than its affiliate Island Services, Inc. (Island Services). The company was also directed to refinance some of its existing debt in order to obtain a $300,000 line of credit to finance its fuel purchases.

Block Island Power Company is a public utility located in the town of New Shoreham which sells, at retail, electric power on Block Island. Block Island is located approximately ten miles off the southern coast of Rhode Island. The company obtains fuel oil used to run its generators

---

1. The record indicates that a motion to consolidate these cases was filed by the town of New Shoreham on January 8, 1986. The town then filed a motion to sever on October 31, 1986. Neither motion was acted upon. These cases were argued before us on a consolidated basis, and we treat them as such.

from its affiliate Island Services. Franklin W. Renz, the president, treasurer, and majority stockholder of the company, owns 99 percent of its stock. He is also the sole owner of Island Services.

On March 30, 1984, the Public Utilities Commission (the commission) issued its report and order in which it found that the company was paying 12 percent more for fuel obtained from Island Services, than it would have been paying if it had purchased its fuel directly from independent wholesale fuel suppliers. After determining that the company was capable of procuring its own fuel oil directly, the commission proposed three alternatives from which the company could choose in order to reduce fuel costs.[2]

Thereafter, the company informed the commission that Island Services would no longer sell fuel to the company on the terms outlined by the commission. The company represented to the commission that it was seeking to purchase fuel through third parties. Accordingly, the company then solicited bids for 100,000 gallons of fuel oil from six potential bidders. One bid was received, and pursuant to that bid of $1.1501 per gallon, the company purchased 100,000 gallons of fuel. The Division of Public Utilities (the division) objected to the bidding procedure and hearings were held in June 1984, to investigate.

Based on those hearings, the commission found that the bid fuel specifications were beyond industry standards, resulting in fuel costs which were unreasonably high. The commission concluded that the company's actions discouraged the making of bids

and had the effect of inflating fuel costs. The commission then approved a fuel cost of $0.989 per gallon. In addition, after finding that the company had failed to comply with the March 30, 1984 order to reprice the Island Services-Block Island Power fuel-pricing mechanism, the commission ordered the company to pay a $4,600 refund to its ratepayers for the fuel-adjustment rates charged by the company for May 1984.

In June 1984, the company again solicited bids for 100,000 gallons of fuel oil pursuant to the commission's revised bid specifications. The company received a low bid of $0.91 per gallon. The company did not purchase the fuel from the low bidder, a New Jersey corporation. Instead it purchased the fuel from Island Services at that cost. At that time, the commission expressed concern that the purchase of fuel from sources other than the low bidder could have the effect of subverting the bidding process, making future bids more difficult to obtain.

By September 1984, the company's fuel supply was nearly exhausted. The company did not rebid for October fuel supplies, instead it continued to purchase fuel from Island Services for $0.91 per gallon. The commission approved this fuel charge as a basis for a fuel-adjustment charge to the ratepayers for October 1984. The commission viewed the company's failure to make a timely application for an October fuel-adjustment charge as another instance of the company's noncompliance with the March 30, 1984 order.

---

2. The commission's alternatives provide as follows:

"1. If the Company desires to continue to purchase its fuel supply from Island Services, Inc., the contract between Island Services, Inc. and the Company should be redrafted to include a pricing mechanism similar in nature to the analysis noted above which sets the price of fuel to the Company at a rate which is equivalent to the total cost that would be incurred by the Company if it purchased the fuel directly. The revised contract should be prepared in time for review and

approval at the compliance hearing for this docket.
"2. If the Company desires to purchase fuel directly, the appropriate adjustments to capital structure, rate base and the other components of the Company's rate case should be brought to our attention for review and approval at the compliance hearing.
"3. If the Company proposes to employ some alternative method of fuel procurement, the appropriate adjustments should be brought to our attention in the same manner as noted above."

On November 21, 1984, the commission issued its Seventh Compliance Report and Order which approved the purchase of 200,000 gallons of fuel from Island Services at a price of $0.89 per gallon. In January 1985, the town moved to modify the order, claiming that it was unfair to ratepayers because it set an inflexible financing-cost charge. The commission declined to modify the order.

The commission issued its Ninth Compliance Report and Order on April 19, 1985. This order rejected the company's fuel-financing plan to purchase fuel from Island Services at a markup of $0.065 per gallon, plus fuel financing at the prime rate plus 2 percent. Also, the commission directed the company to solicit proposals from at least five financial institutions in order to liquidate its long-term debt held by the Home Life Insurance Co. and to provide a maximum line of credit of $300,000 for the purchase of fuel.

The company received three firm financing proposals which were reviewed by the commission in its Twelfth Compliance Report and Order. The commission determined that the cost of refinancing the long-term debt would be de minimus and would allow the company to obtain a $300,000 line of credit for fuel purchases. Accordingly, the commission then ordered the company to refinance its long-term debt in order to obtain a $300,000 line of credit to be used for fuel purchases only. The commission further ordered the company to purchase fuel directly from wholesale suppliers, commencing on or before September 30, 1985.

Since issuing the report and order of March 30, 1984, the commission has promulgated numerous orders to ensure its implementation. In its twelfth order, the commission ordered the company to obtain a loan from a financial institution of its choice in order to refinance the Home Life debt at a cost no higher than 1 percent over the prime interest rate, as well as to provide a line of credit not to exceed $300,000 for fuel purchasing, at interest not higher than 0.5 percent over prime. Furthermore,

the company was ordered to commence purchasing its own fuel no later than September 30, 1985, and that fuel used prior to that date should be priced in a manner similar to that used in July and August 1985.

On August 22, 1985, the company applied to this court for a stay of the twelfth order. The stay was denied. The town then moved to consolidate these cases on appeal.

The company raises two issues on appeal:
1. Whether the commission erred in its analysis of the cost of refinancing its debt structure?
2. Whether the commission's restrictions on the amount and use of the new line of credit, and use of the fuel-adjustment-clause revenues, infringe upon management prerogatives?

At the outset, we wish to make clear that it is within our power to quash the company's petition for certiorari on the theory of res judicata because the company failed to appeal from prior compliance orders concerning the same issues. However, we choose to address these issues on their merits.

In reviewing public utilities cases, the Supreme Court will not engage in factfinding; that is the function of the Public Utilities Commission. *Interstate Navigation Co. v. Burke*, 465 A.2d 750, 755 (R.I.1983); G.L.1956 (1984 Reenactment) § 39–5–3. The standard for review of decisions and orders of the commission is whether the "commission's findings are lawful and reasonable, are fairly and substantially supported by legal evidence, and are sufficiently specific to enable us to ascertain if the evidence upon which the commission based its findings reasonably supports the result." *Violet v. Narragansett Electric Co.*, 505 A.2d 1149, 1151 (R.I.1986); *Narragansett Electric Co. v. Burke*, 505 A.2d 1147, 1149 (R.I.1986); *Roberts v. Narragansett Electric Co.*, 490 A.2d 506, 507 (R.I.1985); *Roberts v. New England Telephone and Telegraph Co.*, 487 A.2d 136, 138 (R.I.1985). In situations in which it becomes impossible for us to properly re-

view decisions and orders of the commission due to insufficient facts and findings upon which the commission "rests its decision, or the reasons or true bases for its conclusions, we will not speculate thereon nor search the record for such evidence or reasons. Neither will we decide for ourselves what is proper in the circumstances. Instead, we will remand the case in order to afford the commission an opportunity to fulfill its obligations in a supplementary or additional decision." *Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, 121 R.I. 122, 130, 396 A.2d 102, 106 (1979); *United Transit Co. v. Nunes*, 99 R.I. 501, 505, 209 A.2d 215, 217–18 (1965).

Findings of the commission are presumed reasonable unless they are "shown to be clearly, palpably, and grossly unreasonable by clear and convincing evidence." *Block Island Power Co. v. Public Utilities Commission*, 505 A.2d 652, 655 (R.I.1986). In reviewing the commission's actions, the court is not concerned with the methodology by which a decision was reached, rather we are concerned with the fairness and reasonableness of the commission's end result. *Narragansett Electric Co. v. Burke*, 505 A.2d at 1149; *Wakefield Water Co. v. Burke*, 502 A.2d 816, 820 (R.I.1986); *South County Gas Co. v. Burke*, 486 A.2d 606, 607 (R.I.1985). When an order of the commission is made in the exercise of administrative discretion, the court will reverse only when the commission has acted without or in excess of its authority, or when it has acted illegally, arbitrarily, or unreasonably. *Wakefield Water Co.*, 502 A.2d at 820; *Narragansett Electric Co. v. Burke*, 122 R.I. 13, 20, 404 A.2d 821, 826 (1979), *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980); *United Transit Co. v. Public Utility Hearing Board*, 96 R.I. 435, 443, 192 A.2d 423, 428 (1963); *Stone v. Public Utility Hearing Board*, 88 R.I. 211, 213, 145 A.2d 204, 205 (1958); *Berberian v. Public Utility Hearing Board*, 83 R.I. 28, 30, 112 A.2d 876, 877

(1955); G.L.1956 (1984 Reenactment) § 39–5–3.

■ The company argues that the commission erred in determining the cost of refinancing the Home Life debt as an additional $1,025. In asserting this position, the company claims that the commission failed to include the interest charge on the debt owed to Island Services in the company's capital structure. To the contrary, § 39–3–28 provides that in order to be binding, any contractual arrangement between an affiliate and a public utility, exceeding $500 must be in writing and filed with the commission. The commission found that no such financing agreement had ever been filed with it.

We do not find that the commission acted illegally, arbitrarily, or unreasonably in excluding the interest charge from its calculations in determining the cost of refinancing the Home Life debt. Moreover, the evidence presented to this court indicates that no financing agreement was ever filed with the commission and thus supports the conclusion that the commission acted reasonably in excluding the interest charge.

■ The company next argues that the commission's actions in ordering the company to refinance and in restricting the amount and use of the new line of credit constitute "an unwarranted invasion into the field reserved to management." *United Transit Co. v. Nunes*, 99 R.I. at 513, 209 A.2d at 222. We hold that it does not.

The commission issued its report and order on March 30, 1984. Since that time, the commission has directed the company to comply by numerous compliance orders in response to the company's repeated failure to comply with the March 30, 1984 order.

In its report and order the commission proposed three alternative schemes by which the company could purchase fuel. The company never objected to the proposals, nor did it comply with them. The company's repeated failure to comply with the report and order led the commission to

determine that noncompliance resulted from the company's own actions. Hence, the commission questioned the company's management credibility.

The commission made clear its intent in this matter in its ninth compliance order when it said:

"Make no mistake about our intent in this matter. Our intent is to put the finances of [the company] on such a footing that it may, without reliance on any affiliate, purchase fuel in the marketplace so that its rate payers may obtain the best possible price for fuel. We intend to accomplish this by the close of this summer. We will tolerate no further noncompliance or delay in accomplishing this goal and compliance with our March 30, 1984 Order No. 11202."

As we have said in the past, we are not concerned "with the method used to attain a particular result but with the fairness and reasonableness of the end result itself." *Michaelson v. New England Telephone & Telegraph Co.*, 121 R.I. 722, 741, 404 A.2d 799, 809–10 (1979). We find the end result in this case to be fair and reasonable.

We are of the opinion that the company's assertion that the commission has overstepped its authority in its twelfth order is without merit. The commission has repeatedly requested that the company comply with the March 30, 1984 order. The company has repeatedly failed to comply. Consequently, the commission issued its twelfth order, which somewhat limits the company's options. In light of the company's defiant behavior in continuing to ignore the commission's report and order, we find that the commission's actions are appropriate.

■ The town of New Shoreham objects to two aspects of the twelfth order, claiming that the commission erred in (1) failing to include a provision for the company to use its fuel tanks and fuel handling equipment for fuel sales to third parties; and (2) continuing for the month of September 1985, the method of pricing fuel used in

July and August 1985. We believe that the commission acted within its discretion with regard to these issues, and we shall not interfere with its decision.

For the reasons stated, the petition for certiorari is denied and dismissed. The writ heretofore issued is hereby quashed. The papers in the case are remanded to the commission with our decision endorsed thereon.