**PAWTUCKET POWER ASSOCIATES LIMITED PARTNERSHIP et al.**

v.

**CITY OF PAWTUCKET et al.**

No. 92–83–Appeal.

Supreme Court of Rhode Island.

March 22, 1993.

Dennis J. Duffy, James Purcell, Partridge, Snow & Hahn, Providence, for plaintiffs.

Patrick J. Quinlan, Quinn, Shechtman & Teverow, Providence, for defendants.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal by Pawtucket Power Associates Limited Partnership and EMI/Pawtucket, Inc., its general partner and a Rhode Island corporation (PPA), from a judgment entered in the Superior Court denying PPA a tax exemption pursuant to the provisions of G.L.1956 (1988 Reenactment) § 44–3–3(20)(a), as amended by P.L.1992, ch. 449, § 1 and on a cross appeal by the defendant, the city of Pawtucket, its mayor, and its tax assessor (city), from a limitation of tax assessment pursuant to § 44–3–18(B). We reverse the judgment of the Superior Court insofar as it denies PPA a tax exemption. We therefore do not reach the question of the cross-appeal filed by the city. The facts of the case are set forth in a comprehensive stipulation as follows:

"1. Pawtucket Power Associates Limited Partnership ('PPA') is a Massachusetts limited partnership, of which EMI/PAWTUCKET, INC. ('EMI'), a Rhode Island corporation, is the general partner.

"2. PPA owns and operates a cogeneration facility (the 'Facility') located within the City of Pawtucket (the 'City') on land leased from Colfax Realty Company ('Colfax Realty') and described as Assessor's Plat 59, Lot 19, and Assessor's Plat 61, Lots 5, 190 and 192. Neither PPA nor EMI is engaged in any other business activity unrelated to the Facility.

"3. PPA operates the Facility exclusively for the production of steam and electricity for sale pursuant to two private long-term contracts negotiated at arms-length. The Facility makes both steam and electricity in a sequential cogeneration process. Natural gas, oil and air are converted to heat energy, which is then converted both to electricity in a combustion turbine and, in combination with water and other materials, to steam in a heat recovery steam generator; such steam is then both converted to electricity in a steam turbine and also used as a final product for sale.

"4. Steam produced at the Facility is sold exclusively to Colfax, Inc., a Rhode Island corporation ('Colfax'), and electricity produced at the Facility is sold exclusively at wholesale to New England Power Company ('NEP'), a Massachusetts corporation, pursuant to an Agreement dated as of December 14, 1987, which does not allow property tax expenses to be passed on.

"5. All of the machinery and equipment located at the Facility and used by PPA in the production of steam and electricity for sale was purchased after December 31, 1974 as new items.

"6. All steam sold by PPA to Colfax is consumed in manufacturing processes at Colfax's industrial food oil manufacturing plant located on a lot adjacent to the Facility on land also leased from Colfax Realty, an affiliate of Colfax. The delivery of such steam is effected via a pipe bridge which structurally connects the Facility to Colfax's manufacturing plant as an integral part of Colfax's production process. Colfax formerly generated its steam requirements with its own on-site steam plant, which plant has been and continues to be treated by the City as tax-exempt manufacturer's machinery and equipment. Upon the termination of PPA's lease, title to the Facility will vest in Colfax Realty.

"7. At the request of PPA, PPA and the City in November of 1988 commenced negotiations regarding a tax agreement to specify property tax amounts applicable to the Facility.

"8. On January 30, 1989, the Division of Taxation of the Rhode Island Department of Administration ('DOT') issued a declaratory ruling pursuant to R.I. Gen.

Laws § 42–35–8 (the 'DOT Ruling') that PPA's ownership and operation of the Facility would cause PPA to be a 'manufacturer' for Rhode Island sales and use tax exemption purposes. DOT ruled that PPA's machinery and equipment used at the Facility to produce steam and electricity (as more specifically listed in the DOT Ruling, the 'Machinery') qualifies for the sales and use tax exemption of R.I. Gen. Laws § 44–18–30(W) as 'manufacturing machinery and equipment.' * * * The City was not a party to nor given prior notice of the PPA's request for the DOT Ruling.

"9. PPA holds no public utility franchises, monopoly powers, eminent domain powers, or exclusive service territories, and does not have the right, the ability, or the obligation to provide steam, electricity or any other utility service to the public or to any party other than Colfax and NEP. PPA has not displaced or caused any party to discontinue receiving service provided by any public utility.

"10. On March 21, 1988, the Federal Energy Regulatory Commission ('FERC') certified the Facility's status as a 'qualifying facility' as defined in FERC's regulations (18 CFR §§ 292, et seq.) and found that 'no electric utility, no electric utility holding company or any combination thereof has any ownership interest in the facility.' Such regulations of FERC expressly provide that qualifying facilities, such as the Facility, are excluded from the definition of 'electric utility company' under the Public Utility Holding Company Act, are exempt from utility rate regulation under the Federal Power Act, and are exempted from all state law or regulation respecting electric utility rates, finances or organization. Id. at § 292.602. * * * The City was not a party to nor given prior notice of PPA's request for the FERC order.

"11. On February 3, 1989, the Rhode Island Public Utilities Commission (the 'PUC') issued a Declaratory Judgment (the 'PUC Order') pursuant to R.I. Gen. Laws § 42–35–8 that PPA's ownership and operation of the Facility as set forth herein would not cause PPA to become a 'public utility' under Rhode Island law. * * * The City was not a party to nor given prior notice of PPA's request for the PUC Order.

"12. On January 21, 1991, PPA filed a notice of intention to bring in a property tax account to the City pursuant to R.I. Gen. Laws § 44–5–15.

"13. On March 14, 1991, PPA filed an account of its tangible property located within the City as of December 31, 1990 pursuant to R.I. Gen. Laws § 44–5–16 (the 'Account'). The Account indicated that PPA's tangible property located at the Facility consists primarily of machinery and equipment costing $26,337,900 which is used exclusively in the production of steam and electricity for sale and which qualifies for the property tax exemption provided at R.I. Gen. Laws § 44–3–3(22) for new manufacturer's machinery and equipment.

"14. The Account also indicated that the value of the conventional, non-cogenerating energy production capacity that would otherwise have been necessary to install to supply Colfax with steam was $380,000.

"15. On May 29, 1991, the City issued a property tax bill to PPA in the amount of $732,710.28, which bill reflects an assessment of tangible property at the Facility other than real estate of $14,652,330 (the 'Assessment'). * * * Such Assessment includes as taxable property all of the Machinery utilized by PPA at the Facility exclusively in the production of steam and electricity for sale.

"16. On June 11, 1991, PPA paid the first installment of the Assessment in the amount of $90,809.96. On August 15, 1991, PPA paid the second installment in an identical amount. The third installment is payable on December 15, 1991.

"17. On or about September 30, 1991, PPA received a recast bill from the City and a cover letter * * * .

"18. The parties to this litigation agree to stipulate as to the correctness of the valuation amounts set forth in the

Account * * *. The primary issue before this court is whether the Machinery is exempted from property taxation by the City under R.I. Gen. Laws § 44–3–3(22). The challenge by the defendants to said exemption is that PPA is not subject to the exemption because it is not a 'manufacturer' pursuant to R.I. Gen. Laws § 44–3–3(20) and therefore is ineligible for the exemption under R.I. Gen. Laws § 44–3–3(22).

"19. In the event that PPA is determined not to be a manufacturer and the Machinery were therefore not exempt from property taxation under § 44–3–3(22), the issue before this Court would then be whether the provisions of R.I. Gen. Laws § 44–3–18(B) respecting the maximum assessment of cogeneration facilities is applicable to the Facility and whether the Assessment is therefore illegal, void and excessive.

"20. During December of 1990, PPA did engage in the production and sale of electricity to NEP and in the production of steam used for industrial and heating purposes at the Facility. For the year ending December 31, 1990, 100 percent of the income derived from the activities at the Facility were derived from the sale of electricity sold to NEP by PPA.

"21. For the first six months of 1991, no less than 80 percent of the income derived from the activities at the Facility were derived from the sale of electricity manufactured by PPA to NEP, and no less than 10% of the total energy output of the Facility on a BTU basis consisted of steam as the final product, as opposed to electricity."

The sole question presented to this court is whether PPA's machinery meets the definition of exemption set forth in § 44–3–3(22). This section reads as follows:

"New manufacturing machinery and equipment acquired or used by a manufacturer and purchased after December 31, 1974. Manufacturing machinery and equipment is defined:

(a) As that machinery and equipment which is used exclusively in the actual manufacture or conversion of raw materials or goods in the process of manufacture by a manufacturer as set forth in subdivision (20) of this section * * * ."

Under the stipulation of facts there is no question that the machinery was purchased after December 31, 1974, as new items, and it was found by the trial justice that PPA's machinery and equipment is used exclusively for the purpose of transforming raw materials, that is, natural gas, oil, and air into a finished product, that is, steam and electricity.

■ However, the trial justice determined that § 44–3–3(20) was conclusive in disqualifying PPA for this exemption since she held as a matter of law that it met the definition of a public utility pursuant to G.L.1956 (1990 Reenactment) § 39–1–2(7), as amended by P.L.1992, ch. 133, art. 34, § 2. This last section purports to define the term "public utility" as follows:

"(7) [E]very company operating or doing business in intrastate commerce and in this state as a railroad, street railway, common carrier, gas, liquefied natural gas, electric, water, telephone, telegraph, and pipeline company, and every company owning, leasing, maintaining, managing, or controlling any plant or equipment or any part of any plant or equipment within this state for generating, manufacturing, producing, transmitting, distributing, delivering, or furnishing natural or manufactured gas, steam, electrical, or nuclear energy, heat, light or power, directly or *indirectly* to or for the public * * *, and provided further, that the term 'public utility' shall not include any company; (i) Producing or distributing steam or heat from a fossil fuel fired cogeneration plant located at the [U]niversity of Rhode Island South Kingston, Rhode Island." (Emphasis added.)

It is interesting to note as set forth in paragraph 11 of the stipulation of facts that the Rhode Island Public Utilities Commission issued a declaratory judgment on February 3, 1989, holding that PPA's ownership and operation of the facility described in the stipulation of facts would not cause PPA to become a 'public utility' un-

der Rhode Island law. The ruling of the Public Utility Commission (commission) was based upon substantially the same facts as have been stipulated for purposes of this controversy. The ruling was as follows:

"(i) The Commission rules, pursuant to Section 42–35–8 of the General Laws and Section 1.6(c) of its Rules of Practice and Procedure, that PPA's ownership and operation of the Plant as a QF[1] in the particular manner discussed herein will not cause PPA to be considered a public utility under Title 39 of the General Laws, and the Commission does not intend to regulate the sale of steam in such circumstances. (ii) Moreover, the Commission has historically waived jurisdiction in those instances where the necessary quantum of rate paying customers has not been realized. Specifically, in the instant set of facts, only one recipient of each type of service is involved. Small customer bases such as this have invariably been deemed by the Commission as de minimis in scope and thereby insufficient to trigger the regulatory process. (iii) Such ruling, however, is expressly limited to the facts as discussed herein, including, without limitation, PPA's lack of market power over its purchaser of steam. In the event that PPA were to exercise such market power or cease to be a QF, the foregoing conclusion might be different."

The trial justice took the position that the ruling of the commission was not binding upon the court since she was construing the statute for purposes of municipal taxation as opposed to looking at the question of supervision by the commission of the rates to be charged by PPA. It is true that the city did not participate in the proceedings held before the declaratory judgment was issued by the commission. Nevertheless, we find ourselves in the somewhat anomalous position of having to deal with a declaratory judgment issued by the commission that holds that PPA is not a public utility as that term is defined in § 39–1–2(7) and a diametrically opposed determination of the Superior Court that for the purpose of municipal taxation PPA is a public utility as that term is defined in § 39–1–2(7), the identical statute.

■ In *City of East Providence v. Public Utilities Commission*, 566 A.2d 1305 (R.I.1989), we affirmed a declaratory judgment by the commission that held that Newbay Corporation (also a cogenerating facility) was not a public utility or an electric utility as those terms were defined under title 39 of the General Laws. We recognized the commission as the appropriate agency to define the term "public utility," subject to our review, and stated that we have repeatedly held that we would show great deference to the factfinding of the commission. *Id.* at 1307; *Town of New Shoreham v. Burke*, 519 A.2d 1127 (R.I. 1987); *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 446 A.2d 1376 (R.I.1982). We further stated that we would review the commission's holding of law under a de novo standard. Applying these principles, we examined the various provisions of chapter 20 of title 39 and affirmed the holding of the commission. It is true that we emphasized the fact that Newbay was not yet an operating facility. However, it is also a well-recognized doctrine of administrative law that deference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency. *See, e.g., Young v. Community Nutrition Institute*, 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986); *Chemical Manufacturers Association v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); *Lawrence County v. Lead–Deadwood School District No. 40–1*, 469 U.S. 256, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Deference is accorded even when the agency's interpretation is not the only permissible interpretation that

---

**1.** See stipulation No. 10 for FERC ruling on "qualified facility," or QF.

could be applied. *Young,* 476 U.S. at 981, 106 S.Ct. at 2365, 90 L.Ed.2d at 967.

Certainly the commission has been entrusted with the interpretation and implementation of title 39, which deals with all activities relating to public utilities and carriers. It is true that the commission is not an agency that has been entrusted with the enforcement and interpretation of matters relating to municipal taxation. However, when the General Assembly chose to give tax exemption to certain manufacturers subject to an exception that public utilities would not be entitled to such an exemption, reference was required to be made to § 39–1–2(7) for the definition of a public utility. Thus the Legislature referred to a body of statutory law administered by the commission for the purpose of defining the term "public utility."

We are of the opinion that the Superior Court should have applied a more deferential standard in defining a term that had already been defined by the supervising administrative agency taking account of mixed questions of law and fact. Since the Legislature referred to the public utilities statute for the definition of an exception to an exemption, a declaratory judgment of the agency concerning whether PPA constituted a public utility was entitled to deference and has great persuasive force.

We have examined the written decision of the trial justice as well as the written decision of the commission and are of the opinion that in all the circumstances of this case, in light of the stipulated facts, and the deferential standard of review, the declaratory judgment of the commission is more persuasive. We therefore hold as a matter of law that PPA is not a public utility as that term is defined under title 39 of the General Laws. Pawtucket Power Associates is entitled to the tax exemption provided by § 44–3–3, subsections (20) and (22). In view of this conclusion we do not reach the question raised by the cross-appeal concerning the valuation of cogeneration energy systems.

For the reasons stated, the appeal of PPA is sustained. The cross appeal of the city is denied pro forma. The judgment of the Superior Court is reversed, and the papers in the case may be remanded to the Superior Court with directions to enter judgment in favor of PPA as entitled to a tax exemption and also to the refund of tax payments previously made, together with interest thereon.