Sheldon WHITEHOUSE et al.

v.

William DAVIS et al.

No. 2000–10–Appeal.

Supreme Court of Rhode Island.

June 5, 2001.

Terence J. Tierney, Asst. Attorney General, John Andre Langlois (DEM), Providence, for Plaintiff.

Gregory L. Benik, Thomas C. Plunkett, Providence, for Defendant.

Present LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

**OPINION**

GOLDBERG, Justice.

This case came before the Supreme Court on April 4, 2001, on appeal from a decision by a justice of the Superior Court that decreed a statute requiring funding for a specific environmental hazard, an oil

spill or threatened oil spill, applicable to the remediation of an environmental hazard caused by the stockpiling of millions of automobile tires.[1] We agree with the statutory construction employed by the trial justice respecting the availability of funds from the Oil Spill Prevention, Administration and Response Fund (fund) which was created by G.L.1956 chapter 12.7 of title 46(act), and affirm the decision permitting money to be spent to dismantle the stockpile of tires, thereby preventing a catastrophic discharge of a petroleum-based product into the waters of the state.

## Facts and Travel

The facts in this case are not in dispute. William Davis and Eleanor V. Davis (Davis or defendants) are the owners of a site in Smithfield, Rhode Island, which has become known as the "Davis Tire Pile" (Davis site). Throughout the years, Davis permitted approximately ten million tires to be dumped at this site.[2] In 1992, the Department of Environmental Management (plaintiffs or DEM) declared the tire pile an extreme environmental hazard and prepared a response plan for a possible fire and the resultant melting of the tires. DEM determined that the site is hydrologically connected to Narragansett Bay (bay), and that a fire and its resultant release of significant amounts of oil and petroleum byproducts into the bay would be disastrous to Rhode Island's marine environment. In March 1993, DEM filed an action in Superior Court against Davis that eventually led to the Site Stabilization Plan; an endeavor designed to remove the tires and remediate the site. However, the funds available to implement this plan were depleted in 1999. On October 1, 1999, having no other source of money with which to continue the removal and in the context of this pending lawsuit, DEM moved for a declaratory judgment asking the Superior Court to declare the expenditure of money from the fund to be consistent with the statutory purposes of the act. Although Davis was the original defendant in this action, Mobil Oil Corporation, Exxon Corporation, d/b/a Exxon Company, USA, Motiva Enterprises, LLC, and Sunoco, Inc. (intervenors), have intervened as members of the Rhode Island Petroleum Association.

The intervenors objected to this proposed use of the fund, arguing that the act does not permit funds set aside for oil spill prevention and response to be used to remediate a tire dump. Essentially, the intervenors claimed that the legislative intent behind the act did not contemplate the expenditure of funds for this purpose. In a written decision, the motion justice granted declaratory relief, reasoning that a fire at the Davis site would result in the "dissemination of oil, petroleum, and petroleum by-products into the water, the amount of which would be classified as an oil spill into the waters of our beloved State." Further, he found that "[t]he threat of the release of oil, petroleum, and petroleum by-products in this case is real and actual without the [c]ourt having to connect some obscure dots to obtain a

1. Pursuant to Rule 25(d) of the Superior Court Rules of Civil Procedure, Attorney General Sheldon Whitehouse was substituted in his official capacity as the successor for former Attorney General Jeffrey Pine.

2. Before attempting to resolve the problem of the tire pile at the Davis site, the Department of Environmental Management and the Environmental Protection Agency (EPA) were in-

volved in attempting to remove approximately 600 drums of chemical waste from the site in 1984. After completing a feasibility study on the site, the EPA determined that the removal of the chemical waste was paramount, therefore no plans for the removal of the millions of tires at the site was implemented at that time.

tenuous result." Final judgment entered on December 17, 1999. The defendants, and the intervenors, have appealed.

## Standing and Mootness

■ As an initial matter, we recognize the unusual posture of this case. A declaratory judgment was sought in the context of a pending civil action to which the intervenors joined with respect to a discrete issue: whether or not the fund may be used to cover the cost of removing millions of tires from the Davis site. We shall assume, without deciding, that the parties to this action have standing to prosecute this appeal. Further, before oral argument in this case, plaintiffs filed with this Court a motion to dismiss the appeal on mootness grounds arguing that the issues have been rendered moot because the site has been fully remediated and there are no remaining tire piles in the State of Rhode Island that DEM believes would qualify for cleanup costs derived from the fund. We deferred consideration of that issue until after oral argument. We are satisfied that this issue is justiciable.

This Court has held that on occasion we will review "questions of extreme public importance, which are capable of repetition but which evade review." *Witt v. Moran,* 572 A.2d 261, 264 (R.I.1990) (quoting *Morris v. D'Amario,* 416 A.2d 137, 139 (R.I. 1980)); *see also Associated Builders & Contractors of Rhode Island Inc. v. City of Providence,* 754 A.2d 89, 90 (R.I.2000); and *Sullivan v. Chafee,* 703 A.2d 748, 752 (R.I.1997). In the instant case, plaintiffs have acknowledged the existence of other tire fields in the state, and that the refusal to resort to the fund for remediation of these sites is a nonbinding administrative determination made by a state agency. It is clear that the danger from these environmental hazards and the availability of funds for their remediation are issues of extreme public importance. What is

equally clear is that the refusal to reach the fund for the clean up costs of the remaining sites was an administrative determination that can be revisited at any time. Accordingly, we conclude that this issue is capable of repetition yet evading review and decline to dismiss the appeal on mootness grounds. Further, in reaching the merits of this case, were we to rule in their favor, the intervenors might be entitled to seek additional relief in the Superior Court in the form of replenishment of the fund from other state resources.

## The Act and the Fund

■ The intervenors have argued that the judgment of the Superior Court must be reversed because the plain language of the act, coupled with available legislative history, clearly and unambiguously demonstrates that the act was intended solely for the cleanup of oil spills and threatened oil spills. Additionally, the intervenors contended that the act does not allow for expenditures from the fund when there has been no release or threatened release of oil from the Davis site. We deem these arguments to be without merit.

■ We have previously determined "that an administrative agency will be accorded great deference in interpreting a statute whose administration and enforcement have been entrusted to the agency." *In re Lallo,* 768 A.2d 921, 926 (R.I.2001) (citing *In re Advisory Opinion to the Governor,* 732 A.2d 55, 76 (R.I.1999); *Pawtucket Power Associates Limited Partnership v. City of Pawtucket,* 622 A.2d 452, 456 (R.I.1993); *Defenders of Animals, Inc. v. Department of Environmental Management,* 553 A.2d 541, 543 (R.I.1989)). "[W]here the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and defer-

ence as long as that construction is not clearly erroneous or unauthorized." *Gallison v. Bristol School Committee,* 493 A.2d 164, 166 (R.I.1985). "Moreover, in interpreting a legislative enactment, it is incumbent upon us 'to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes.'" *State v. Flores,* 714 A.2d 581, 583 (R.I.1998) (quoting *Brennan v. Kirby,* 529 A.2d 633, 637 (R.I.1987)).

Chapter 12.7 of title 46 entitled "Oil Spill Prevention, Administration and Response Fund," provides in pertinent part:

> "The legislature finds and declares that the release of oil or hazardous substances into the environment presents a real and substantial threat to the public health and welfare, to the environment, and to the economy of the state. The legislature therefore concludes that it is in the best interest of the state and its citizens to provide a readily available fund for the payment of expenses that the department of environmental management incurs in the protection of the environment of the state from the release of oil." Section 46–12.7–1.

One of the purposes of the fund, as stated in § 46–12.7–5.1(3), is to "[p]rovide emergency loans and to cover response and cleanup costs and other damages suffered by the state or other persons or entities from oil spills or threatened oil spills * * *." The passage of this act was the direct result of a 1996 oil spill that occurred when the grounding of the North Cape barge off Moonstone Beach in the town of South Kingstown caused 828,000 gallons of petroleum to be discharged into Block Island Sound and neighboring coastal ponds. The spill killed thousands of lobsters, as well as numerous fish and other wildlife and marine life. Both commercial and recreational fishing and shell-fishing were banned in most of Rhode Island Sound and Block Island Sound for weeks, and, in some places, for months after the spill. The state's shellfishing industry was virtually crippled as a result of this maritime catastrophe.

Here, DEM, the agency entrusted with administering and enforcing the act, faced the very real threat of a tire fire at the Davis site that would produce thousands of gallons of oil and petroleum by-products from the melting tires that eventually would be discharged into the bay, resulting in many of the same catastrophic consequences as the 1996 spill. To eliminate that threat, DEM opted to undertake the removal of the tires from the site, thus avoiding another potential environmental catastrophe to the state's marine environment. This was an ambitious undertaking. It is undisputed that a fire would have produced thousands of gallons of oil that would wreak havoc on bay and marine life. The intervenors have argued that such a disaster does not qualify as a "spill" within the meaning of the act. The act, however, is necessarily a prophylactic measure, with the intended purpose of preventing oil spills and the discharge of petroleum by-products into the environment. The reason for the fund is clear; the Legislature sought to prevent a situation akin to the one faced in 1996 and avoid the danger posed to our valuable fishing and tourism industries by establishing a mechanism to fund the costs of both the prevention and clean up of oil spills. In accordance with its statutory mandate, DEM determined that a fire at the Davis site would create the very catastrophe that the act intended to avoid, and that the fund should be used to remove the tires from the site. We deem this to be a reasonable interpretation of a statute by the administrative agency charged with its enforcement. For these reasons, we uphold the decision allowing the Oil Spill Prevention, Administration

and Response Fund to be used to dismantle the Davis tire pile, thereby preventing an oil spill and its concomitant damage to the environment.

For the reasons stated herein, the intervenors' and defendants' appeal is denied and dismissed. The judgment appealed from is affirmed and the papers in this case are remanded to the Superior Court.

Chief Justice WILLIAMS did not participate.