DECISION
This matter is presently before the Court on Club Giza's (Giza) appeal from a decision of the Department of Business Regulation (DBR). The DBR, after a de novo review, upheld the decision of the Licensing Board, revoking Giza's BX alcoholic beverage license. Jurisdiction is pursuant to G.L. 1956 § 42-35-15
 I Facts and Travel
Stage Bands, Inc. (Appellant), operates Giza, a Class BX alcoholic beverage licensed establishment at 95 Hartford Avenue, Providence, Rhode Island. In the wake of a series of occurrences on the night and into the early morning of July 28-29, 2006, the Providence Board of Licenses (Board) held an emergency hearing on July 30, 2006 to consider the Providence Police Department's request to revoke Giza's alcoholic beverages license. At the conclusion of the hearing, the Board revoked Appellant's class BX alcoholic beverage license. Thereafter, that *Page 2 
revocation was timely appealed to the DBR, which conducted hearings taking place on October 3, 5, 13, and 19, 2006.
At the hearings, testimony was presented to the DBR's hearing officer. The DBR's decision lays out the facts in extensive detail, and this Court adopts those facts. (Decision DBR No. 06-L-0147.) Essentially, those facts are that the Hartford Avenue pedestrian gate was not locked. A disturbance involving at least ten people occurred inside the club at approximately 1:50 a.m. on July 29, 2006. The house lights were not turned on and the loud music was not turned off during the disturbance inside the club. A second disturbance involving at least five people occurred inside the club. The testimony from all police representatives was credible, including that of Officer Mulligan. A third disturbance occurred outside the club on July 29, 2006. This disturbance involved five to eight people who were kicking a subject who was lying on the ground and had been shot in the head. Rescue vehicles could not enter the parking lot of Giza because the entrance was impassable due to the bottleneck of cars. Paramedics had to park the rescue vehicle on Hartford Avenue and carry the stretcher into the parking lot. At least four people were arrested at the Appellant's premises or in the vicinity of the premises on July 29, 2006. All five police officers assigned to District 5 responded to the scene on July 29, 2006. Officers from the gang unit, representative from the narcotics unit, NRT units, and District 2 vehicles responded to the scene on July 29, 2006.
All parties were represented by competent counsel at the hearing. At the hearing, a number of parties, including a number of Providence police officers of various ranks as well as Mr. Anthony Massarone (Massarone), the owner of Giza, testified. The pertinent testimony and facts are as follows: *Page 3 
Providence Police Department Patrolman Matthew D. Mulligan (Mulligan), a four-year veteran of the police force, and Patrolman Chin (Chin), also a four-year veteran of the Providence police force, were on private detail the night of July 28, 2006 from 11:00 p.m. to 3:00 a.m. at Giza. (Tr. Oct. 3 2006 at 22, 25, 73-75.) Mulligan explained that the lay-out of the club and parking lot was such that there was only one entrance/exit for vehicles from the club's parking lot. After entering, cars must drive around the building to reach the parking lot and main door to the club. Id. at 32-33.
Mulligan further testified that around midnight, he witnessed several club bouncers escort one individual out of the club. The individual attempted to reenter several times but was denied entry by club security. Id. at 33-37. Mulligan was informed by security to "keep an eye on" the person because he may return later with a firearm.Id. at 37. At approximately 12:40 a.m., Mulligan observed the individual leave the premises in a Lexus automobile. Id. at 37. Mulligan took down the license plate and called another officer to obtain information about the vehicle. Id. at 67-68. Approximately an hour later, at 1:40 a.m., promoter Gloria Rodriguez came out to seek the officers' assistance with a disturbance in the back of the club.Id. at 37. Mulligan and Chin entered the club. Inside, Mulligan found it dark, and loud music still playing. Because it was hard to see through the darkness and they had to push through the crowd, it took the officers a couple of minuets to reach the back of the club.Id. at 38-39. Once there, Mulligan observed approximately ten to twenty people, including club employees, punching and grabbing at one another; however, it was hard for him to give an exact number due to the darkness of the club. Id. at 38-39, 60-61. Because he feared use of pepper spray or other weapons would cause a panic in the club, Mulligan did not use any weapon in attempting to stop the disturbance, choosing instead to try to separate and disburse as many people as possible. *Page 4 
The officers were unable to completely stop the first disturbance before a second disturbance, this time involving five to ten people, including club employees, broke out in the middle of the club.Id. at 62. Mulligan noted that the house lights in the club remained off during the entire incident. Id. at 43. Again not wanting to use a weapon for fear of panic inside the club, Officer Mulligan, who was uniformed and self-identified as a police officer, attempted to subdue the crowd, but people refused to stop fighting.Id. While attempting to settle the second disturbance, the officers were informed by patrons and staff that a disturbance had broken out in the parking lot. Id. at 42.
Because the entrance/exit was "packed" with patrons trying to leave the club, it took the officers a couple of minutes to make their way to the parking lot. Id. at 44. As he was exiting, Mulligan heard a "pop" that he later determined was a gun shot. Id. at 46. Once outside, Mulligan observed a number of fights across the parking lot. He also observed an individual on the ground, surrounded by a group of people who appeared to be kicking him. Id. at 44-45. When both officers reached the victim on the ground, people were still kicking the victim who had been shot in the head. Id. Shortly after exiting the club, Mulligan saw approximately thirty police officers attempt to enter the club parking lot but they were unable to do so because the entrance to the lot was rendered impassable by the departing vehicles.Id. at 46-47.
Chin next testified that he observed club security escort an individual out of Giza around 12:30 in the early morning hours of July 29, 2006. Id. at 76. Chin informed the individual that he would not be allowed to re-enter the club. Id. at 77. Though the individual did try to re-enter the club, his entrance was refused. At approximately 1:30 a.m., Chin saw the individual, who was on a cell phone, hang up his phone and "run after the Lexus." After a couple of minutes, he got into the Lexus and departed. Id. at 78. At that point, a club doorman indicated to Chin that *Page 5 
he should "watch out for that guy, he might have a piece[,]" though Chin was uncertain whether the doorman was referring to the ejected individual or the driver of the Lexus. Id.
Chin recounted how he and Mulligan responded to the fight at the back of the club, where he indicated he saw ten to twelve people fighting.Id. at 80-82. He explained how the two officers tried to break up the disturbance but as he was pulling people apart, a fight began behind him. He decided it was too much for them to control and he tried to radio for back up but had to repeat himself several times due to the loud music and noise of the club. Id. He repeated Officer Mulligan's explanation for not employing pepper spray and explained that he was afraid to draw his service weapon because the club conditions created a risk that a patron could take it from him. Id. at 83. Chin indicated that when the second fight, which he testified involved five to seven people, broke out in the middle of the dance floor, he moved to try to separate the participants but had to abandon his effort and respond outside when notified of the large fight going on in the parking lot. Id. at 84. Chin noted the slowed response time due to the crowded exit. Id. at 85.
As he exited Giza, he heard a call of "shots fired" over his radio.Id. at 86. Once outside, he observed an individual with a pool of blood behind his head lying on the ground, surrounded by a group of five to eight people who were kicking him. Id. at 86, 90. Chin tried to move the crowd away from the subject and upon determining that the individual had suffered a gun shot wound, he called for rescue.Id. at 90. Because the entrance was blocked by traffic, the rescue could not get into the parking lot and had to park on Hartford Avenue while they carried a stretcher into the lot. Id. at 92. On cross-examination, Chin clarified that the individual ultimately charged with the shooting was not the same individual that had been ejected from the *Page 6 
club earlier in the night. Id. at 103. Chin testified that he did not know if either the shooting victim or suspect had been in the club earlier that night. Id.
Providence Police Detective John St. Lawrence (St. Lawrence), a Detective in the License Enforcement Unit and 27-year veteran of the Providence Police Department, acts as the liaison between the Police Department and the Providence Board of Licenses. St. Lawrence makes recommendations to the Board concerning disciplinary action taken against licensees, as well as license renewals and referrals. (Tr. Oct. 3, 2006 at 113.)
In the early morning of July 29, 2006, St. Lawrence arrived at the scene at 1:50 a.m., after he received an emergency call from Officer Chin. Id. at 115-116. St. Lawrence was not able to enter the parking lot due to the traffic exiting the one opening to the parking lot and had to park on the entrance ramp to Route 10. Id. at 116, 120. Because of the chain on the pedestrian gate on the Hartford Avenue side of the parking lot, he chose to climb the fence to enter the lot.Id. at 117. He testified that when he arrived, there was a man lying on the ground, bleeding, with a gunshot wound to his head. He also observed fighting was still taking place in the parking lot while about 20 police officers were on scene, and at least four individuals were in handcuffs. Id. at 119-120. He further testified that the club manager was not present when he arrived on the scene. Id. at 124. St. Lawrence testified that four to five people were arrested, three for disorderly conduct and one for the shooting. (Tr. Oct. 5, 2006 at 28-29.)
St. Lawrence testified that the previous owner of the liquor license was Club Sanctuary (Sactuary), a club that also played hip-hop music and had a history of violence problems. (Tr. Oct. 3, 2006 at 132-33.) Giza's written business plan was presented to the Board at the May 4, 2004 transfer hearing. The business plan acknowledged the concerns of the Board, one being that there was only one entrance/exit to the parking lot causing congestion at closing time. It also *Page 7 
acknowledged the history of violence that Sanctuary had encountered. The business plan addressed this problem by stating that Giza planned to play live rock and roll music which would attract a more upscale crowd. The plan also stated that Giza would have the live rock and roll sets end at staggered intervals, so people would be leaving the parking lot at different times and the club would provide valet parking. Lastly, the plans stated Giza would install security lighting and cameras in the parking lot. Id. at 134-137. St. Lawrence further testified that Giza did, in fact, implement a rock and roll theme but eventually changed to a Cape Verdian theme. furthermore, St. Lawrence testified that to his knowledge, Giza never offered valet parking, and security cameras were never installed. Id. at 137-38.
St. Lawrence testified that on September 12, 2005, Giza appeared before the Board. At that hearing, the Board ordered Giza to appear monthly before the Board to submit a list of the scheduled entertainment for the month. This type of "tracking" is commonly used at many venues in Providence so that the Board can determine, based on the history of the entertainer, the proper amount of police detail necessary for that event. Id. at 137-138. On September 23, 2005, Giza also appeared before the Board in regard to a number of disturbances in the parking lot where arrests were made. The club was given a "strong warning" and a review within 30 days. Id. at 142-144. St. Lawrence further testified that Giza appeared before the Board on July 12, 2006, in response to underage drinking arrests on the premises, and Giza received a warning due to that incident. Id. at 142. On cross-examination, St. Lawrence agreed that Giza had only two prior violations even though on its record there were four entries. (Tr. Oct. 5, 2006 at 18.)
Giza's attorney elicited testimony from St. Lawrence to try to further its claim that Giza was being treated harsher than clubs that had received a number of violations. When questioned, St. Lawrence testified that in regard to Sanctuary, a significant number of complaints had been *Page 8 
filed against it in the three to four years that it was licensed; however, he did not want to give an exact number as he did not have that file in front of him. He also testified that these complaints involved shootings and assaults, and Sanctuary never had its license revoked. (Tr. Oct. 5, 2006 at 4-5.) He testified that Club Confetti, another night club in Providence, had a history of violence including shootings and assaults. St. Lawrence noted that the license was never revoked; however, the Board refused to renew Club Confetti's license at the end of the licensing period. Id. at 5. Another Providence club, Club Diesel, also had a history of violence and shootings in the vicinity of the club, according to St. Lawrence, but the Board did not revoke the license; instead it allowed the license to transfer. Id. at 5-7.
Detective Green, a member of the Providence Police Department for approximately 17 years, testified on October 5, 2006. (Tr. Oct. 5, 2006 at 43.) He was assigned to District 5, Green was not on duty the night of the shooting but was called in to headquarters after 2:00 a.m. on July 29, 2006. Id. at 46-47. He interviewed three witnesses: George Ortiz (Ortiz), Alexandro Cruz (Cruz), and Luis Mercado (Mercado). Cruz, a person of interest, was charged with disorderly conduct due to his admission of participating in an altercation inside and outside the club. Id. at 53-55. Mercado, was charged with the shooting and several firearm charges. Id. at 54. Ortiz, who accompanied the shooting victim into the club that night, was charged with disorderly conduct due to a physical altercation he participated in inside and outside the club. Id. at 53, 55. Green testified that Ortiz told him that the victim had accompanied him to Giza, and they both were inside the club prior to the shooting. Id. at 55-56. Green also confirmed that the shooting had taken place inside the Giza parking lot.Id. at 54. He also identified the photograph of Stephen Rodriguez (Rodriguez), another person who was arrested that night for disorderly *Page 9 
conduct. Rodriguez had been arrested on Atwells Avenue inside a vehicle that had fled the scene. Id. at 57.
Lieutenant Robert Lepre, (Lepre) a member of the Providence Police Department for 18 years and Commander of District 5, which includes the location of Giza, testified that he was called to Giza at approximately 2:00 a.m. on July 29, 2006. Id. at 64-65. He testified that he observed many officers on the scene when he arrived. All of the District 5 officers under his command had responded to Giza — he was not sure whether this was four or five officers. Id. at 69. Lepre testified that this response is significant because if there were any priority calls during the time the District 5 officers were on the scene, an officer from another district would have to respond, leaving that own officer's district uncovered. Id. at 70-71. Lepre also testified that he could not locate a manager when he arrived at the scene even after asking two security personal employed by the club to locate a manager. Id. at 68-69.
Lepre further testified that on May 11, 2006, he responded to Giza to investigate a report of underage drinking. He and two patrolmen arrested three people with suspicion of underage drinking. Id. at 73-74. He also testified that on June 30, 2006, he responded to Giza when one of the detail officers had expressed concern regarding the large crowd.Id. at 77. He testified that he and about half of his District 5 officers remained at the club until 2:00 a.m. to disperse the crowd and because of concerns due to the bottleneck of cars at the parking lot exit which would make it difficult for any emergency vehicles to enter.Id. at 80-81. Lepre testified that he also responded to Giza on July 14, 2006, when he observed another large crowd that night. He testified that he has never seen valet parking or security cameras in the Giza lot. Id. at 82-84.
Lepre clarified that he did not actually find any violations when he responded to Giza on June 30, 2006 and July 14, 2006. However, he also testified that on the night of July 28-29, *Page 10 
2006, he saw the gang unit people from the investigative bureau, the District 7 Sergeant, District 2 cars, and the state police.Id. at 89-90. Also called to or present at the scene were representatives from the narcotics unit, those from Homeland 8 and NRT units. Id. 104-105.
Anthony Massarone, the owner of Giza, testified that the club was open from 2004 until it was closed by the Board on August 1, 2006.Id. at 107. He testified that Giza has four exits and a maximum capacity of 674. Id. at 108. The parking lot to the club holds approximately 400 cars. Id. at 113. Massarone testified that Giza did offer valet service in the summer of 2005 for a few weekends. However, he testified that they discovered the valet service did not cut down on the bottleneck problem. He testified that instead, he chose to place a parking attendant in the lot throughout the evening to assist with the flow of traffic and to make sure no cars were blocked in.Id. at 111. Massarone also testified that he installed lights on all the poles in the parking lot and added exterior lights to the building. He did not install security cameras due to the cost, and he believed they were not necessary. He also testified that beginning in April of 2005, all patrons were searched for weapons before they were allowed entry into the club. Id. at 112, 122. He further testified that although a chain was on the Hartford Avenue pedestrian gate, the gate was not locked. The chain was there to discourage patrons from parking on the street or in lots of other businesses along that street.Id. at 114-16.
Massarone testified that he, in fact, did open Giza with rock and roll as its main theme. He testified he planned on also incorporating jazz, country, and other types of music as well. He explained that it was difficult to maintain having rock and roll as the main theme because there were only two promoters in the city of Providence and they often prohibited acts from playing at their venues if they played at another venue. They also had been in existence for a long time, and many national bands would refuse to book through anyone but the two promoters. Id. at *Page 11 
118. Massarone testified that he had to choose other types of music in addition to rock and roll because he could not sustain his business on live rock and roll music alone. Id.
Massarone testified that on the evening of July 28-29, 2006, in addition to the two person police detail, he had on staff ten security personnel and two parking attendants at Giza. Id. at 120. He testified that more security than normal was on because the club promoter was fairly new. He testified that "reggaeton night" at Giza had been advertised on the club's website for a significant period of time. He also testified that there are two different rooms inside the club that can play two different types of music. He testified this way, he was able to keep crowds smaller. Id. at 122-24.
Massarone testified that he received the license for Giza as a transfer from Sanctuary. He also reiterated the concerns of the Licensing Board regarding the bottlenecking of the parking lot at closing. He further confirmed what the officers already stated had been his plan. He testified that Giza followed the plan for approximately 100 rock and roll shows from May of 2004 to July of 2006. (Tr. October 13, 2006 at 11.) He also had parking attendants in the lot to control the flow of traffic on busy nights. He testified that he never offered jazz or country music, but Giza did have a rockabilly and country rock shows, as well as Celtic bands and other types of live bands. Id.
at 11-12. He testified that the first time he was brought before the Board was for an underage drinking incident in June of 2006. Id. at 22.
Sergeant Peter Costello, a member of the Providence Police Department for 16 years, testified on October 13, 2006. From May of 2004 to January of 2006, he was the Licensing Bureau Supervisor. He served as the liaison between the Board and the Licensing Bureau. (Tr. Oct. 13, 2006 at 26-27.) He testified that prior to the transfer of the liquor license from Sanctuary to Giza, he and Massarone met with the Olneyville Business Association to present *Page 12 
and discuss the business plan for Giza. Id. at 28. He stated that at no time did the Board tell Mr. Massarone that he was not allowed to play certain types of music; the Board only wanted to track the entertainment to make sure the proper police detail was ordered if necessary. Id. at 31-32.
Costello further testified that during his time as Supervisor, one issue he had with Giza was underage drinking (id. at 37), and the other was a warning given to Giza for disturbances and arrests made on September 23, 2005. Id. at 40. He further testified that during his tenure, he was not aware of any problem with traffic at Giza that required police response. Id. at 37.
After a de novo review, in a written decision dated December 4, 2006, the DBR affirmed the decision of the Board, revoking the Appellant's alcoholic beverage license. The Appellants timely filed appeal from the decision of the DBR to this Court in accordance with § 42-35-15.
 II Standard of Review
This Court is not empowered to hear this appeal de novo. The scope of the Court's review of the decision of the DBR is limited by G.L. 1956 § 42-35-15(g), which provides:
 The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Page 13 
This Court, when reviewing the administrative decision, is limited to determining whether legally competent evidence exists in the record to support the decision of the DBR. Town of Burrillville v. Rhode IslandState Labor Relations Bd., 921 A.2d 113, 118 (R.I. 2007); seealso, Johnston Ambulatory Surgical Associates, Ltd. v. Nolan,755 A.2d 799, 804-805 (R.I. 2000.) Thus, the Court must determine whether "substantial evidence" exists to support the decision of the agency.Newport Shipyard v. Rhode Island Commission for Human Rights,484 A.2d 893 (R.I. 1984). "Substantial evidence" is defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." Id. at 897 (quoting Caswell v. GeorgeSherman Sand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)). This Court may not substitute its judgment for that of the reviewing agency regarding the credibility of witnesses or the weight of evidence concerning questions of fact. Ctr. for Behavioral Health v.Barros, 710 A.2d 680, 684 (R.I. 1998); Kachanis v. Bd. of Review,Dep't of Employment and Training, 638 A.2d 553, 55 (R.I. 1994);Costa v. Registrar of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Barrington Sch. Com. v. Labor Rel.Bd., 608 A.2d 1126, 1138 (R.I. 1992); Berberian v. Dept. ofEmployment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record."Milardo v. Coastal Resources Management Council, 434 A.2d 266, 272
(R.I. 1981). "Deference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency." Pawtucket Power Associates Ltd.Partnership v. City of *Page 14 Pawtucket, 622 A2d 452, 456 (R.I. 1996). However, questions of law are not binding upon a reviewing court and may be reviewed de novo.Johnston Ambulatory, 755 A.2d at 805.
 III Analysis
Section 3-5-23(b) of the Rhode Island General Laws provides:
 (b) If any licensed person permits the house or place where he or she is licensed to sell beverages under the provisions of this title to become disorderly as to annoy and disturb the persons inhabiting or residing in the neighborhood, or permits any gambling or unlawful gaming to be carried on in the neighborhood, or permits any of the laws of this state to be violated in the neighborhood, in addition to any punishment or penalties that may be prescribed by statute for that offense, he or she may be summoned before the board, body, or official which issued his or her license and before the department, when he or she and the witnesses for and against him or her may be heard. If it appears to the satisfaction of the board, body, or official hearing the charges that the licensee has violated any of the provisions of this title or has permitted any of the things listed in this section, then the board, body, or official may suspend or revoke the license or enter another order. (Emphasis added.)
This Court has qualified that the statute makes clear that if the licensee violates "any of the provisions" or permits "any of the things" listed in § 3-5-23, the DBR has the power to revoke the club's license. Moreover, in Rhode Island, a licensee has an affirmative duty to prevent his or her establishment from becoming disorderly. "The legislature in enacting the pertinent provision of the statute, intended to impose upon such licensee the obligation to maintain an efficient and affirmative supervision over the conduct of his patrons in his place to such an extent as is necessary to maintain order therein." Cesaroni v.Smith, 98 R.I. 377, 382-383, 202 A.2d 292, 295 (1964). TheCesaroni Court goes on to state, "a licensee assumes an obligation to affirmatively supervise the conduct of his patrons so as to preclude the generation therefrom of *Page 15 
conditions in the neighborhood of like character to conditions that would result from maintenance of a nuisance therein." Id. at 383,202 A.2d at 296; see also, Manuel J. Furtado, Inc. d/b/a/The Helm v. Sarkas, 118 R.I. 218, 373 A.2d 169 (1977).
Furthermore, for an action to be considered disorderly so as to annoy the neighborhood, the act need not directly annoy a neighbor. As our Supreme Court explained,
 The word `disorderly' as used here contemplates conduct within the premises where liquor is dispensed under a license that causes either directly or indirectly conditions in the neighborhood in annoyance of or disturbing to the resident thereof. . . . the legislature, in enacting this statute, intended to condition the continued operation of establishments under these licenses on the ability of the licensee to prevent the occurrence of conditions therein which either act directly on the sensibilities of the neighbors or which, by giving rise to conduct outside the premises, by indirection offend the sensibilities of the neighbors. Cesaroni, 98 R.I. at 384, 202 A.2d at 296.
In this case, the record indicates that three disturbances occurred within a matter of minutes: two inside Giza and one outside, culminating in a victim being shot in the head and kicked while his blood pooled on the ground around his head.[1] Giza argues in its appeal that there is no connection between the shooting in the parking lot and the club itself. Therefore, it concludes, the DBR revoked the license without any evidence of disorderly conduct perpetuated by those inside Giza.
The Appellees contend that this argument is without merit because the person who was shot was clearly inside the parking lot outside Giza. Furthermore, Appellees note that a number of people were spotted kicking the victim while inside the gates of Giza.
Even if there were no direct connection between the parking lot and the shooting, the case law of Rhode Island has made clear that a reasonable inference that the cause culminated inside *Page 16 
that establishment can be made when a disturbance occurs immediately outside a drinking establishment. See A.J.C. Enterprises v.Pastore, 473 A.2d 269 (R.I. 1984). "[T]here need not be a direct causational link between incidents occurring outside or nearby a drinking establishment and its patrons. Such a link is established when it can be reasonably inferred from the evidence that the incidents occurred outside a particular establishment and had their origins within." Id. at 275.
In this case, the facts are much stronger than a reasonable inference that the shooting outside was somehow connected to events inside Giza. There was uncontradicted testimony from Detective Green that the victim was inside the club before he was shot. He and his friend engaged in an altercation inside the club and later, outside the club, engaged in another altercation. (Tr. Oct 5, 2006 at 54-56.) Additionally, all testifying witnesses indicated that the victim's body was located inside the fenced in parking lot of the club. Furthermore, there was testimony from many of the witnesses at the DBR hearing that the door to Giza emptied directly into the parking lot. There is only one entrance/exit into the lot. It is more than reasonable for the DBR to conclude that the fights that culminated inside Giza and the shooting that occurred in the fenced in parking lot outside Giza occurred as a result of the activities inside Giza. See, A.J.C. Enterprises at 275.
Giza emphasized that after the hearings, the person charged with the shooting of the victim was no longer charged with that crime, and therefore, there is no nexus between Giza and the shooting.[2]
However, whether the shooter was a patron of the club does not negate the fact that three disturbances in one night occurred at Giza and a person who was confirmed to have been inside the club fighting was shot in the head in the Giza parking lot. As held by Cesaroni, a *Page 17 
liquor licensee is held responsible for any disorderly actions that occur on his premises. Also, "even though the responsibility may be onerous, a licensee agrees to assume such an obligation by its acceptance of the license." Shillers Inc. v. Pastore, 419 A.2d 859
(R.I. 1980).
Giza also argues that it has been subjected to selective and disparate treatment. Giza has provided this Court with transcripts of hearings involving other clubs in the city of Providence and the punishments that those clubs received. Giza argues that the DBR chose to punish Giza more harshly because of some secret unarticulated agenda.
The Appellees argue that all this information pertaining to other clubs was not brought up in the DBR hearings and cannot be brought up now. Appellees also argue even if the arguments about how other clubs have been treated in comparison to Giza can be considered in this Court, the decisions in other cases have no bearing on how Giza was treated in this instance.
It is well-settled that, "[i]n order to prevail on a selective enforcement claim, one must do more than establish that the challenged regulation was not applied with absolute uniformity." Felice v. RhodeIsland Board of Elections, 781 F. Supp 100 (D.R.I. 1991). The court further noted that,
 [s]pecifically, the claimant must prove:
 1. That she was treated differently from others similarly situated, and
 2. That such selective treatment was the product of intentional or purposeful discrimination in that it was based on impermissible considerations such as membership in a protected class, intent to inhibit or punish the exercise of a constitutional right or malicious bad faith intent to injure the claimant. Id. (citing Yerardi's v. Randolph Selectmen, 932 F.2d 89, 92 (1st Cir. 1991); LeClair v. Saunders, 627 F.2d 606, 609-10 (2nd Cir. 1980); E T Realty v. Strickland, 830 F.2d 1107, 1114 (11th Cir. 1987)).
This Court has found in the record that Giza did claim that it was being treated differently from other Providence clubs which incurred calls to police or disturbances that included violence. *Page 18 
Giza claimed, without providing any evidence, that it was being treated more harshly because of the music it played. The DBR found there was no instance of invidious discrimination against Giza, and this Court agrees. The law in Rhode Island is clear when it comes to liquor licensing and the police power of the state.
Our Supreme Court has noted:
 The public has a vital and continuing interest in the control and supervision of the liquor traffic. Therefore the business of selling beverages, if permitted at all, is clearly and completely subject to the police power of the state in order that the health, morals and safety of the people generally may be protected against the evils of intemperance. In the exercise of that power the state may impose restrictions and burdens, however great, which the legislature may deem advisable to prescribe, so long as such provisions are not discriminatory or inconsistent with federal or state constitutional requirements. Di Traglia v. Daneker, 83 R.I. 227, 230, 115 A.2d 345, 347 (1955) (citing Tisdall Co. v. Board of Aldermen, 57 R.I. 96, 188 A. 648 (1936)).
A liquor license may contain "some aspects of property rights," but this Court is also mindful of the police powers with respect to the sale of intoxicating beverages. In Tisdall, the Supreme Court noted:
 It is well settled in this state and elsewhere that the business of the sale of intoxicating liquor is so clearly and completely subject to exercise of the police power of the State that it may even be entirely prohibited by the State (citations omitted), . . . or it may be permitted subject to such restrictions and burdens, however great, as the State legislature may deem it advisable to impose, so long as they are not discriminatory in such a way as to be in violation of the equal protection clause of the fourteenth amendment and the procedure is not such as to violate its due process clause. Tisdall, 57 R.I. at 103, 188 A. at 652.
In this case, the DBR was well within its discretion to decide to revoke the license of Giza. It listened to extensive testimony and considered all of the witnesses and testimony before it. A major concern of the DBR was not only the shooting and disturbances inside and outside *Page 19 
Giza, but also the disorderly scene necessitating the detail officers having to call for police back up. All of District 5 officers arrived on scene, thus imposing a danger to the other communities as an officer would have to leave his post to respond to an emergency situation in District 5. (Tr. Oct 5, 2006 at 70-71.) In addition to the four to five officers from District 5, and the two detail officers, some twenty other police enforcers, including detectives, gang unit officers, and state troopers, were at the scene. This police response alone caused an indirect disturbance to those areas that were now left unprotected due to the police presence at Giza. (Tr. Oct. 5, 2006 at 70-71.)
Furthermore, the record reveals that the problem with the parking lot was never corrected, and despite the fact that there is no indication Giza was in violation of any code, the bottleneck made it impossible for the ambulance and emergency vehicles to get into the lot. (Decision DBR No. 06-L-0147 at 31.) Also, the pedestrian gate, even if left unlocked, had a chain placed around it with a padlock attached. In an emergency, the police did not waste the precious time it would take to run to the gate to take the chance it was locked. Instead, they had to jump over the fence at the fastest and easiest spot they could find. Additionally, this Court notes the findings of the DBR that at no time did anyone turn the house lights on and lower the music inside the club to quell the disturbances inside. Id. at 30. TheCesaroni Court states: "the responsibility of a licensee for the conduct of his patrons within the licensed premises that makes it disorderly within the meaning of the statute is established by evidence showing a toleration or acquiescence in such conduct by the licensee."Id. at 383, 202 A.2d at 296. Overall, the record evidences that Giza tolerated the fighting by failing to turn on the lights and turn off the music, which may have helped to prevent some of the confusion in the club enabling the officers and staff to more readily disburse the crowd. Lastly, the record reflects that during this entire *Page 20 
incident and following the incident, there was no manager or owner on site to attempt to control the situation or to talk to the police after the incident occurred.
After reviewing the record as a whole, this Court finds there was competent evidence before the DBR to conclude that Giza violated § 3-5-23(b). The DBR has discretion to decide whether to suspend or revoke a license of an establishment, § 3-5-23(b), and this Court is satisfied in its review of the record that the DBR did not here abuse its discretion.
 IV Conclusion
After a review of the entire record, this Court finds that the DBR's decision to revoke the BX liquor license of Giza was supported by reliable, probative and substantial evidence in the record, is not an abuse of discretion, and is not affected by error of law. The Appellant's rights have not been substantially prejudiced. Accordingly, the decision of the DBR is affirmed. Counsel shall submit the appropriate order for entry.
[1] At the time of the hearing, the victim was alive but paralyzed. It is unclear from the record as to the permanency and extent of the victim's paralysis.
[2] Since the time of the party's briefs, Luis Mercado, who was originally arrested for the shooting, pled guilty and is serving a sentence at the ACI in relation to this shooting.